UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
EMILIE MORSE,

                            Plaintiff,

     -against-

JETBLUE AIRWAYS CORPORATION

                         Defendant.
------------------------------------------------------------------X

No. 09 Civ.5057
(KAM)(ACC)


**PLAINTIFF'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT JETBLUE'S
<u>MOTION FOR SUMMARY JUDGMENT</u>**


BERANBAUM MENKEN LLP
Attorneys for Plaintiff
80 Pine Street, 33rd Floor
New York, NY 10005
Ph: (212) 509-1616
Fax: (212) 509-8088


Of Counsel:

John A. Beranbaum
Jennifer L. Smith

## TABLE OF CONTENTS

TABLE OF CONTENTS..............................................................................................i

TABLE OF AUTHORITIES.....................................................................................iii

PRELIMINARY STATEMENT................................................................................1

STATEMENT OF FACTS.........................................................................................1

    1.    Morse's Service as an Inflight Supervisor................................................1

    2.    Working as a Non-Flying Inflight Supervisor.........................................2

    3.    Morse's Forced Placement on Disability Leave......................................3

    4.    JetBlue's Restructuring of the Inflight Supervisor
        Position in Spring 2006.............................................................................3

    5.    Morse's Repeated Requests for a Reasonable Accommodation............5

    6.    JetBlue's Termination of Morse................................................................7

ARGUMENT...............................................................................................................9

    I.    Morse's EEOC Filing Tolled Her State and City Law Claims...............9

    II.    Morse is Not Judicially Estopped From Pursuing Her
         Disability Discrimination Claims..............................................................9

    III.    JetBlue Failed to Reasonably Accommodate Morse's Disability.........12

         A.    JetBlue Violated its Duty of Reasonable Accommodation
              By Failing to Engage with Morse in an Interactive Process.....................13

         B.    Morse Could Perform the Essential Functions of the Inflight
              Supervisor Job Both Before and After Reorganization............................15

         C.    Completion of Crewmember Training was Not an Essential
              Function of the Inflight Supervisor Job.....................................................18

         D.    The Accommodations Morse Request Would Not Have
              Imposed an Undue Burden on JetBlue.......................................................19

         E.    Morse Did Not Seek an Indefinite Leave..................................................20

F.   As an Alternative to Returning Morse to Inflight Supervisor,
     JetBlue Could Have Re-Assigned Her to Another Job
     As a Reasonable Accommodation............................................................21

G.   JetBlue Did Not Reasonably Accommodate Morse
     For 18 Months.......................................................................................24

H    The Fact That Morse Was Not Formally "Cleared"
     For Work is Irrelevant............................................................................26

IV.  JetBlue Discriminatorily Terminated Morse.......................................................26

CONCLUSION...................................................................................................30

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Benjamin v. Health and Hospitals Corp.*, No. 07-CV-2487,
    2009 WL 2959622 (Sept. 11, 2009 E.D.N.Y.) ....................................... 29

*Borkowski v. Valley Central School District*, 63 F.3d 131
    (2d Cir. 1995) ........................................................................................28

*Brady v. Wal-Mart Stores*, 531 F.3d 127 (2d Cir. 2008) ......................... 12,13

*Chasse v. Computer Scis. Corp.*, 453 F.Supp.2d 503
    (D.Conn 2006) ....................................................................................... 29

*Cleveland v. Policy Management Systems*, 526 U.S. 795 (1999) ............. 10,12

*De Rosa v. National Envelope Corp.*, 595 F.3d 99
    (2d Cir. 2010) ........................................................................................ 10

*E.E.O.C. v. Beall Concrete Enterprises, Inc.*, No. 06 Civ. 1779,
    2008 WL 877769 (N.D.Tex.March 15, 2008).....................................29

*EEOC v.Yellow Freight Sustems, Inc.,* No. 98 Civ. 2270,
    2002 WL 31011859, at 23   (S.D.N.Y. Sept. 9, 2002)....................13,15,30

*Esposito v. Deutsche Bank AG*, No. 07 Civ. 6722,
    2008 WL 5233590 (S.D.N.Y. Dec. 16, 2008) .......................................... 9

*Felix v. New York City Transit Authority*, 154 F.Supp.2d 640
    (S.D.N.Y. 2001) ............................................................................... 16,17

*Field v. Tonawanda City School District*, 604 F.Supp.2d 544
    (W.D.N.Y. 2009) .................................................................................. 30

*Floyd v. Mount Sinai Medical  Center Personnel Director*,
    No. 04 Civ. 556, 2005 WL 2174001 (S.D.N.Y. Sept. 8, 2005) .............. 11

*Gantt v. Wilson Sporting Goods Co.,* 143, F.3d 1042
    (6th Cir. 1998) ..................................................................................... 29

*Garcia-Ayala v. Lederle Parenterals, Inc.*, 212 F.3d 638
    (1st Cir. 2000) ..................................................................................... 30

*Gibson v. Lafayette Manor, Inc.*, No. 05 Civ. 082,
    2007 WL  951473 (W.D. Pa.. Mar. 27, 2007) ......................................... 30

*See EEOC v. Greater Baltimore Medical Center, Inc.,*

09 Civ. 2418, 2011 WL 210049 slip. Op. (D. Md. Jan. 21, 2011).......11, 12

*Hall v. New York City Department of Transport,*
   701 F.Supp.2d 318 (E.D.N.Y. 2010) ........................................................ 9

*Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685
   (7th Cir. 1998) ................................................................................ 30

*Holly v. Clairson Industrial, L.L.C.*, 492 F.3d 1247
   (11th Cir. 2007) ............................................................................... 30

*Jackan v. N.Y. State Department of Labor*, 205 F.3d 562
   (2d Cir. 2000) ............................................................................. 12,21

*Jackson v. City of New York*, No. 06 Civ. 1835, 2001 WL 1533471
   (E.D.N.Y. March 3, 2011)...................................................................16

*Kleiber v. Honda of America Manufacturing, Inc.*,
   420 F.Supp.2d 809 (S.D.Oh. 2006) .......................................................... 29

*Kolovos v. Sheahan*, No. 97 Civ. 4542, 1999 WL 1101919,
   (N.D.Ill. 1999) ................................................................................. 29

*Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*,
   263 F.3d 208 (2d Cir. 2001) ............................................................. 14,19

*McBride v. BIC Consumer Products Manufacturing Co.*
   583 F.3d 92 (2d Cir. 2009) ............................................................... 13,14

*McDonnell Douglass Corp. v. Green*, 411 U.S. 792 (1973) ......................... 27

*Norville v. Staten Island University Hospital*, 196 F.3d 89
   (2d Cir. 1999) .................................................................................. 26

*Parker v. Columbia Pictures*, 204 F.3d 326
   (2d Cir. 2000) ........................................................................ 27, 28, 29

*Philbrook v. Ansonia Board of Ed.,* 757 F.2d 476 (2d Cir. 1985)
   *aff'd*, 479 U.S. 60 (1986) ................................................................... 30

*Raytheon Co. v. Hernandez*, 504 U.S. 44 (2003) ..................................... 29

*Ritterband v. Hempstead Union Free Sch. Dist.*, No. 00 Civ. 6628,
   2008 WL 3887605 (E.D.N.Y. Aug. 20, 2008) ......................................... 9

*Roberts v. Royal Atlantic Corp.*, 542 F.3d 363 ..................................... 12,13

*Royal v. Anesthesia Group of Onadaga, P.C.*,
   369 F.3d 113 (2d Cir. 2008) ............................................................. 17,20

iv

*Schroeder v. Suffolk Cty. Comm. Col.*, No.07 Civ. 2060,
    2009 WL 1748869 (E.D.N.Y. June 2, 2009). ........................................... 15

*Shafinsky v. Bell Atlantic*, No. 01 Civ. 3044, 2002 WL 31513551,
    (E.D.Pa. Nov. 5, 2002) ............................................................................. 29

*Shannon v. N.Y.C. Transit Authority*,
    332 F.3d 95 (2d Cir. 2003) ....................................................................... 16

*Stone v. City of Mount Vernon*, 118 F.3d 92 (2d Cir. 1997),
    *cert. denied*, 522 U.S. 1112 (1998)..........................................15, 16, 17, 27

## STATE CASES

*Phillips v. City of New York*, 66 A.D.3d 170
    884 N.Y.S.2d 369, 373-74 (1st Dep't 2009)...............................................14

## FEDERAL STATUTES, RULES AND REGULATIONS

42 U.S.C. § 12111  .................................................................................. 19,21

14 C.F.R. § 121.415.................................................................................18

29 C.F.R. § 1630  ................................................................................ 13,15,26

## PRELIMINARY STATEMENT

The Plaintiff Emilie Morse has brought this action charging her former employer, JetBlue

Airways Corporation, with violating her rights under the Americans with Disabilities Act, 42

U.S.C. § 11201 et seq., and analogous State and City law. JetBlue unlawfully discriminated

against Morse because of her disability by 1) in July 2005, forcing her to take disability leave

when, notwithstanding her disability, she was able to continue performing the essential functions

of her job; 2) in June 2006, refusing to consider and denying her requests that, in accommodation

of her disability, she be allowed to return to her job, modified, if necessary, to eliminate flying or

to transfer her to a non-flying position; and 3) by terminating her for the exhaustion of her leave

without having even investigated her requests for accommodation.  On each of these claims,

there are genuine issues of material fact in dispute, and therefore, JetBlue's Motion for Summary

Judgment must be denied.

## STATEMENT OF FACTS
### 1.      Morse's Service as an Inflight Supervisor

After a long career in the airline industry, Morse began working for JetBlue as an Inflight

Supervisor ("IS") in November 2003. (Morse 9:17-22; 31:20-25). Everyone in contact with

Morse – customers, supervisors, employees she supervised – admired her work.[1] Morse worked

out of JFK Terminal, supervising 75-80 flight attendants. (Id. 15:2-11). She provided advice and

support to the flight attendants and monitored their performance and attendance. (Id. 15:5-16:2;

Jenkins 10:6-10). As such, her duties were administrative and the job sedentary. (Id.) Morse flew

---

[1] Robillard 18:10-19:11; 20:16-18 (calling her an "excellent" supervisor; "she set a bar of taking care of her crew members, being responsive and being a good resource, following through with scheduling issues"); see also  Jenkins 33:12-35:4; Exs. 8 through 15 to Jenkins; Bilak 101:21-102:11; Lewis 97:4-10.

in a plane only occasionally, for "check rides" when she observed crew members. (Morse 18:17-22; 24:21-25:23). She rarely flew more than once per month, and many months not at all. (Id. 25:15-23). Fight records show that of the 19 supervisors at JFK between January 2005 and December 2006, seven flew less than once a month. (Coates Decl. ¶¶ 5 and 6).

Morse, like other ISs, was required to complete yearly training to maintain her qualifications as a flight attendant and be permitted to fly. (Morse 31:2-19; Cozzie 52:5-8). An IS would go on "dequal" status, and not be allowed to fly, if she did not complete training. (Id.). Morse was scheduled to take recurrent training in November 2004, but because she was suffering serious back pain, her supervisor, JFK Manager of Inflight, Valerie Jenkins, permitted her to forego the training and work as an IS while on dequal status. (Id. 24:3-23; 35:14-17).

### 2.    <u>Working as a Non-Flying Inflight Supervisor</u>
From December 2005 until July 7, 2006, Morse worked as an IS on dequal status, performing all the functions of the job except flying. (Morse 102:6-20). Though dequalified, Morse continued her exemplary service. (Robillard 18:10-19:11; Jenkins 33:12-35:4; Exs. 8 through 15 to Jenkins). Her inability to fly caused the airline no problems. On the rare occasions when she was scheduled to go on "check rides," other supervisors voluntarily substituted for her. (Morse 63:4-65:24). Jenkins testified that Morse's medical issues and her inability to fly did not create an operational hardship, and had Morse been permitted to work in a non-flying capacity until her surgery in October 2005, she foresaw no problems. (Jenkins 41:3-42:8; 67:22-16; <u>see</u> <u>also</u> Robillard 43:3-6 [unaware of any planes delayed or canceled because Morse could not fly]). Morse's co-workers were not bothered by her not flying, and her supervisor never received complaints. (Robillard 42:4-10).

2

### 3. Morse's Forced Placement on Disability Leave

In June 2005, JetBlue's People Department (the equivalent of Human Resources) and Inflight Services decided that Morse could no longer work as an IS while on dequal status. (Ex. 4 to Robillard). The decision was not made because of problems with Morse's work or operational difficulties arising from her inability to flying; rather Inflight Services wanted to "draw a line in the sand" and establish a "precedent" of disallowing Flight Supervisors on dequal status from working. (Id. 48:23-50:2).

On June 24, 2005, Robillard gave Morse three options: she could take the next training class to be requalified; contact the Benefits Department to explore leave options; or take a 30-day unpaid leave of absence. (Ex. 3 to Morse [JB 0293]; Morse 104:16-108:18). If she did not select one of those options by July 7, 2005, she would be administratively terminated. (Id.). In response, Morse offered to take recurrent training but Jenkins would not let her for fear that JetBlue would be held liable if she were injured. (Id. 100:3-101:14). Of the options presented her, Morse chose short-term disability leave since that way she could continue to receive at least some compensation. (Id. 120:6-15). Before taking leave, Morse informed her supervisors that her back surgery, originally scheduled for July 7, 2005, had been postponed. (Id. 116:16-117:9). The surgery was later rescheduled for October 12, 2005. (Id. 143:22-144:4). Nonetheless, JetBlue required Morse to take leave effective July 7, 2005, or be terminated. (Id. 122:9-23).

### 4. JetBlue's Restructuring of the Inflight Supervisor Position in Spring 2006

In or about April 2006, while Morse was on disability leave, JetBlue divided IS into four separate positions. (Cozzie 20:16-24:21; Ex. 4 to Cozzie [JB 5919-22]; Ex. 6 to Cozzie [JB 0262-70]). Whereas before, all ISs performed more or less the same tasks (Robillard 32:1-12), after the restructuring the four jobs had distinct functions. Three of the new IS positions,

3

Crewmember Experience, Base Operations and Systems Operations, were based at the terminal or JetBlue's Forest Hills office, and Karen Cozzie, the new Director of Inflight, admitted that flying was not a "core function" of any of them. (Cozzie 24:13-21; 42:23-51:5; Ex. 6 to Cozzie [JB0262-70]). Only Onboard Experience, requiring the IS to conduct check rides, had a "core function" of flying. (Id. 23:15-24:12).

The differentiation of functions among the four positions was reflected in the written Positions Expectations ("PEs"). Before the restructuring there was a single PE for the IS position; among the Essential Functions listed on the PE were duties associated with flying. (Ex. 1 to Morse [JB 0247-48]) With the reorganization, however, flying was no longer an Essential Function for the Crewmember Experience, Base Operations and Systems Operations jobs. (Ex. 6 to Cozzie).

Cozzie tried to obfuscate the fact that flying was not an essential function for three of the four IS jobs. She claimed that "Coordinating Charter Flights," listed as an Essential Function for Systems Operations, required flying. (Cozzie 58:11-60:14; Ex. 6 to Cozzie). But John Lewis, who actually worked as a Systems Operations supervisor, flatly denied that the task involved flying. (Lewis 40:11-13) Lewis testified, moreover, that he performed all the "Essential Functions" of the Systems Operations position, and none of them required flying. (Id. 46:6-13; 49:1-12; Ex. 2 to Lewis [JB 0256-67]).

Similarly, although the PE for the Base Operations supervisor position did not expressly include any flying-related duties as Essential Functions, Cozzie claimed that the Essential Function, "Ensuring Operational Integrity during Irregular Operations," required flying. (Ex. 6 to Cozzie; Cozzie 37:22-38:13). Cozzie, however, admitted that the only time a supervisor would

4

fly in an Irregular Operation was when every flight attendants on active and reserve duty were
unavailable, and she could not recall a specific instance of this occurring. (Id. 39:6-40:8). In
addition, as reflected by its PE, maintaining flight attendant qualifications was no longer a
"Qualification" of the Base Operations job. (Id. 55:21-56:17; Ex. 6 to Cozzie), meaning that
flying also was not considered a qualification of the job.

### 5.   Morse's Repeated Requests for a Reasonable Accommodation

JetBlue had a written policy governing its response to a disabled employee's request for a
reasonable accommodation. (Maguire 18:25-28:8; Ex. 1 to Maguire [JB 0277-81]; Ex. 2 to
Maguire [JB 0178-88]). Under that policy, the employee could make a request to either a
supervisor or People Compliance. (Id. 23:4-25; Ex. 1 to Maguire). Upon receiving an
accommodation request, the supervisor had to "immediately" refer it to People Compliance, the
department with expertise in reasonable accommodations. (Id. 28:4-8). A supervisor could not
deny a reasonable accommodation without having consulted People Compliance. (Id. 28:9-12).
People Compliance was obligated to engage the disabled employee in an interactive process to
review available accommodation options. (Id. 25:10-26:3).

By June 2006, Morse was capable of working so long as, in reasonable accommodation of
her disability, she was not required to fly. (Cammisa 37:13-24; Ex. 1 to Cammisa). Morse made
repeated accommodation requests in June 2006, but none were referred to People's Compliance,
as JetBlue's policy required. (Robillard 111:10-112:20; Cozzie 102:20-103:4). Eileen Maguire,
head of People Compliance, admitted that her department never was consulted about Morse's
requests and played no role in deciding whether she could return to work with an appropriate
accommodation. (Id.; 30:23-31:10; 45:8-13) The task of engaging Morse in an interactive process

was left to her supervisors, whose efforts in this regard were at best nominal.

June 8, 2006, 11 months into her 12-month leave, was the first time anyone from JetBlue communicated with Morse about returning to work. Morse's supervisor, Robillard, advised her then that her leave was set to expire on July 8, 2006, and wrote that she could "reach out to [JetBlue] if there is anything we can do to support your return to work." (Robillard 97:1-15; Ex. 24 to Robillard [0957-60]). The next day, Morse asked Robillard that she be allowed to return her to work as an IS, without flying duties, or be given a transfer her to another job without flying requirements. (Ex. 24 to Robillard; Ex. 25 to [JB 2523]; Morse 181:5-186:4). In conversations with Robillard and Cozzie, Morse identified two supervisory jobs that she had seen listed on JetBlue's intranet for which she was qualified: one in customer service and the other in inflight scheduling. (Morse 183:16-184:4; 186:8-24). Because, as a non-active employee, she could not apply herself, Morse asked Cozzie to "look into" the availability of the jobs, but to Morse's knowledge, Cozzie never did. (Morse 188:11-189:16).

Robillard consistently took the stance that in order to return to work, Morse had to requalify as a flight attendant. (Robillard 97:18-100:4; Exs. 24 through 26 to Robillard). Robillard never referred Morse to People Compliance; instead, he suggested that Morse speak with the benefits team, and again offered his "support" in helping her return to work. (Ex. 26 to Robillard) Morse responded that she was "at a loss" to understand what Robillard's "support" meant since she already had identified several accommodations. (Id.)

On June 12, 2006, Morse emailed People Department's Julia Gomez, explaining that she "ha[d] offered to come back on limited duty and was refused this option," and asking for

6

guidance. (Ex. 15 to Bilak [0131]). Although Morse had clearly made an accommodation

request, Gomez forwarded the email to the Manager of the People Department, Robert Bilak.

(Bilak 70:19-71:20 73:9-14; Ex. 15 to Bilak). Upon receipt of the email, Bilak also bypassed

People Compliance and inexplicably referred the matter to Cozzie, the Inflight Director and

Robillard's supervisor. (Ex. 15 to Bilak; Bilak 76:6-78:21).

> On June 15, 2006, Morse sent a memo to Robillard stating,
>
> the only accommodation I am seeking is to be allowed to return to work in an administrative capacity. I would be happy to return to work TOMORROW in Inflight or, another department within the organization where my talents might best be utilized in a way that is beneficial to JetBlue until such time as I am able (if ever) to once again fly... Again, all I am looking for is a straight and honest answer to my request for this accommodation. (Ex. 20 to Morse [0132]; Morse 336:22-338:6)

On June 30, 2006, Cozzie informed Morse that the airline "d[id] not have a duty/job transition

policy - and our current [Position Expectations] (and past) require that all Supervisors are

qualified [Inflight Crewmembers]," (Cozzie 98:21-99:11; 111:2-10; Ex. 8 to Cozzie [0957-60])

Cozzie admitted that she did not discuss with Morse what JetBlue could do to support her return

to work. (id. 130:12-131:21; Ex. 8 to Cozzie); did not consider whether Morse was making a

request for reasonable accommodation (id.138:17-20); and did not consider whether Morse could

return to work in a different position. (Id. 108:2-9)

**6.   JetBlue's Termination of Morse**

On July 12, 2006, JetBlue terminated Morse's employment. It did so because, wrote

Bilak, she had taken disability leave for 52 weeks in violation of JetBlue's "52 Week

Termination Policy." (Ex. 17 to Bilak [0689]). The decision to fire Morse was made by Cozzie,

Robillard and another Inflight supervisor, without consultation with People Compliance. (Id.

7

86:23-87:10; Maguire 30:23-31:10) The 52 Week Termination Policy provided, in pertinent part:

> Any JetBlue Crewmember who exceeds 52 weeks of time off in a rolling 24-month period may be considered to have abandoned their job and/or be administratively terminated....Crewmembers must be able to perform all essential functions of their position upon a return to work.  If that is not possible the Crewmember may be eligible to request an ADA ... accommodation" (Ex. 1 to Bilak [JB 0223]).

In November 2006, Morse filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission on behalf of herself and other disabled JetBlue employees. She challenged JetBlue's 52-week maximum leave policy and the termination of her employment as violating the ADA. After completion of its investigation,[2] the EEOC issued a Determination, dated November 6, 2008, finding that JetBlue violated Morse's rights under the ADA by failing to engage her in an interactive process to determine the feasibility of a reasonable accommodation; failing to give her a reasonable accommodation to allow her to continue working; and terminating her employment pursuant to a discriminatory leave policy.  (Ex. 1 to Beranbaum Decl.). The EEOC further held:

> The record demonstrates that [JetBlue] has maintained an inflexible 52-week maximum leave policy ... in violation of the ADA.  Under this policy, [JetBlue] does not accord  qualified individuals with disabilities an individualized assessment of whether the employee requires additional medical leave and/or if the individual could return to the same position or a vacant position, with or without reasonable accommodation.  Accordingly, [JetBlue] has maintained a policy that creates a pattern or practice of denying reasonable accommodation to, and discriminating against a nationwide class of individuals with disabilities in violation of the ADA. (Id.).

_____

[2] The proceedings before the EEOC are described in the Memorandum of Law in Support of Plaintiff's Objections to Magistrate Judge's Order Denying her Motion for an Interim Award of Attorneys' Fees and Costs, at 4-8.

8

**ARGUMENT**[3]

## I. **MORSE'S EEOC FILING TOLLED HER STATE AND CITY LAW CLAIMS**

JetBlue argues that Morse's New York State Human Rights Law ("NYCHRL") and New York City Human Rights Law ("NYCHRL") claims are barred by the applicable three-year statute of limitations because she was discharged on July 12, 2006, more than three years before she filed suit. However, numerous courts have held that the statutes of limitations under NYSHRL and NYCHRL are "tolled during the period in which a complaint is filed ... with the EEOC." Esposito v. Deutsche Bank AG, No. 07 Civ. 6722 (RJS), 2008 WL 5233590, at *5 (S.D.N.Y. Dec. 16, 2008); see also Ritterband v. Hempstead Union Free Sch. Dist., No. 00 Civ. 6628 (DRH)(ETB), 2008 WL 3887605, at *9 n. 9 (E.D.N.Y. Aug. 20, 2008) (noting that the statue of limitations for plaintiff's NYSHRL claims was stayed during the pendency of the EEOC  claim). As such, the statute of limitations for Morse's NYSHRL and NYCHRL claims were tolled by her filing the EEOC charge on November 6, 2006. Any claims arising within three years of that date, including her claim for failure to accommodate in July 2005, are therefore timely.

## II. **MORSE IS NOT JUDICIALLY ESTOPPED FROM PURSUING HER DISABILITY DISCRIMINATION CLAIMS**

In making its judicial estoppel argument, JetBlue alleges that "Morse and her doctors certified that she was '100 percent totally disabled' and 'unable to work'" (Defendant's Memorandum of Law, 7), a position at odds with that taken by plaintiff in this litigation. This is simply untrue. Morse consistently stated that she could return to work if given a reasonable

_____

[3] The applicable standard of review for a motion for summary judgment is set forth in this Court's decision in Hall v. New York City Dep't of Transp., 701 F.Supp. 2d 318, 327-28 (E.D.N.Y. 2010).

accommodation. In communicating with the disability insurance carrier, Morse always represented that she was able to return to work in a sedentary position – the same thing she told JetBlue – and UNUM's records acknowledge this.  (Morse 159:5-19; Beranbaum Decl. Ex. 16, UNUM 0015 [acknowledging that "she appears will [sic] be able to return to something in the sedentary range"]; UNUM 0461 ["of note is that [claimant] herself believes she could do sedentary work"];  UNUM 0826 ["claimant more than willing to go to work since only part of job can't do is fly ... but every other fxn can do b/c sitting at desk but ER won't let me"]).

The only conceivable basis for JetBlue to charge Morse with inconsistency is the application for Social Security Disability Insurance ("SSDI") benefits.  As an initial matter, UNUM applied for SSDI benefits on behalf of Morse, so that Morse did not make any "certifications" appearing on her unsigned SSDI application. (Morse 163:12-23) Moreover, even if Morse made such a certification to Social Security, it would not be inconsistent with her current position. Morse never denied to JetBlue that she had a disability. She consistently told her employer that, notwithstanding her disability, she could work with a reasonable accommodation. See Cleveland v. Policy Management Systems, 526 U.S. 795, 802 (1999) (noting that there are "many situations in which an SSDI claim and an ADA claim can comfortably exist side by side"). The statement in the SSDI application that she was unable to work was "made in a forum which does not consider the effect that reasonable workplace accommodations would have on the ability to work." Cleveland, 526 U.S. at 796; see also De Rosa v. Nat'l Envelope Corp., 595 F.3d 99, 104 (2d Cir. 2010) (noting that the Social Security Act does not concern itself with reasonable accommodation, and holding that "[t]he statement 'I am disabled' on an SSDI application should generally be taken as a statement that 'I am disabled for the

10

purposes of the Social Security Act.'").

As to Morse's doctors' allegedly inconsistent statements, an ADA plaintiff's legal claims cannot be judicially estopped by statements she did not herself make. Floyd v. Mount Sinai Medical Center Personnel Director, No. 04 Civ. 556 (NRB), 2005 WL 2174001, at *2, n.2 (S.D.N.Y. Sept. 8, 2005) ("judicial estoppel has only been applied when the record contains factual statements made by the claimant that directly contradict the claimant's later ADA claims.")

Even if a doctor's statements could be used to support judicial estoppel, any apparent inconsistencies in this case were clearly explained by Morse's physicians. Dr. Frank P. Cammisa, Morse's orthopedic surgeon, testified that he wrote that Morse was "100% disabled" based on a mistaken assumption that she was employed as a flight attendant who regularly had to perform strenuous physical tasks. (Pl. R.56.1 Stmt. ¶¶ 31, 42). By his deposition, Dr. Cammisa confirmed the accuracy of his earlier statement to UNUM that Morse could have "performed occupations that are generally performed seated, but have duties that allow alternating between sitting, standing and walking." (Cammisa 51:22-55:Ex. 5 to Cammisa [UNUM 0498-500]). Morse's general practitioner, Dr. Inna Kigel, shared this same opinion. (Kigel 60:2-61:15; Ex. 6 to Kigel).

JetBlue reliance on EEOC v. Greater Baltimore Medical Center, Inc., No. 09 Civ. 2418, 2011 WL 210049, slip. op. (D. Md. Jan. 21, 2011), reconsideration denied, 2011 WL 1327915 (Apr. 6, 2011), is misplaced. Upon reconsideration, the court in Greater Baltimore stressed that at the same time that he was receiving SSDI benefits, the Claimant had repeatedly told his employer that he was able to return to work *without* any restrictions or accommodations. The court held that the statements were irreconcilable, for "[e]ven if [the Claimant] represented that he was able to work with

11

reasonable accommodations in his SSDI application—and not that he was 'totally disabled'—[the] SSDI application is still at odds with his numerous statements during and after his employment ... that he never needed a reasonable accommodation to perform the unit secretary job or other positions he applied for..." Id. at *9.  By contrast, Morse at all times stated that she could work, but because of her disability needed an accommodation. Thus,  as in Cleveland, Morse's claim that she was disabled for purposes of  SSDI is easily reconcilable with her longstanding position that she could have returned to work with a reasonable accommodation.

### III. JETBLUE FAILED TO REASONABLY ACCOMMODATE MORSE'S DISABILITY

An employer violates the ADA when it fails to "'mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee,' unless the employer can establish that the accommodations would 'impose an undue hardship.'" Jackan v. N.Y. State Dep't of Labor, 205 F.3d 562, 566 (2d Cir. 2000) (citing 42 U.S.C. § 12112(b)(5)(A)); see also Brady v. Wal-Mart Stores, 531 F.3d 127, 134 (2d Cir. 2008); N.Y. Exec. Law § 296(3)(a); N.Y. City Admin. Code § 8-107(1). "To establish a 'reasonable accommodation,' a plaintiff bears only a burden of production that is not a heavy one. That is, it would be enough for the plaintiff to suggest the existence of a plausible accommodation, the cost of which, facially, does not clearly exceed its benefits. Once the plaintiff has done this, she has made out a prima facie showing that a reasonable accommodation is available, and the risk of non-persuasion falls on the defendant." Roberts v. Royal Atlantic Corp., 542 F.3d 363, 370-71 (2d Cir. 2008).

12

**A.**   **JetBlue Violated its Duty of Reasonable Accommodation By Failing to Engage with Morse in an Interactive Process**

"The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." Jackan, 205 F.3d at 566 (citing 29 C.F.R. 1630.2(o)(3)). An employer's participation in this process is mandatory whenever the employer knew or reasonably should have known that the employee was disabled. Brady, 531 F.3d at 135-36.

Once the interactive process has been triggered by a request for accommodation, the employer is required to "us[e] a problem solving approach" to:

(1)   Analyze the particular job involved and determine its purpose and essential functions;

(2)   Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;

(3)   In consultation with the individual to be accommodated, identify potential accommodations and assess the effectiveness each would have in enabling the individual to perform the essential functions of the position; and

(4)   Consider the preference of the individual to be accommodated and select and implement the accommodation that is most appropriate for both employee and the employer.

EEOC v. Yellow Freight Systems, Inc., 98 Civ. 2270 (THK), 2002 WL 31011859, at *23 (S.D.N.Y. Sept. 9, 2002) (citing 29 C.F.R. Pt. 1630, App. 1630.9).

In fact, so long as plaintiff has met her light burden of demonstrating "the existence of a plausible accommodation," Roberts, 542 F.3d at 370-71, the mere fact that JetBlue failed to engage in any interactive process whatsoever may be sufficient to constitute prima facie evidence of disability discrimination, though the Second Circuit has yet to rule on the question definitively.

13

McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 101 (2d Cir. 2009).

The NYSHRL and NYCHRL also require an interactive process. Phillips v. City of New York, 66 A.D.3d 170, 175-76, 884 N.Y.S.2d 369, 373-74 (1st Dep't 2009). Unlike the ADA, an employer's failure to engage in the interactive process is, by itself, a violation of the NYSHRL and NYCHRL. Id. Therefore, under State and City law, summary judgment is available only where there is no genuine dispute as to whether the employer engaged in the interactive process in good faith. Id. Here, JetBlue has failed to demonstrate indisputably that it engaged Morse in an interactive process, let alone that it did so in good faith. Therefore, summary judgment must be denied.

Morse made repeated requests for reasonable accommodation, contacting her supervisors (Robillard, Jenkins and Cozzie), and the People Department (Bilak and Gomez). Nonetheless, in contravention of its own written policy, JetBlue never referred Morse to People Compliance, the department most knowledgeable about the ADA and best suited to deal with those types of requests. In response to Morse's accommodation request, JetBlue officials offered her platitudes ("supporting her return to work") or sought to shift responsibility away from one another. (See above at 5, 6). Not a single JetBlue official considered whether Morse could perform one of three reconfigured IS positions with or without accommodations. Neither did anyone speak to her about reassignment to either of the two positions she identified as available or confer with her about other available positions. JetBlue's failure to engage Morse in any sort of meaningful exchange constitutes "the antithesis of participation in the interactive process." See Lovejoy Wilson v. NCO Motor Fuel, Inc., 263 F.3d 208, 219 (2d Cir. 2001).

JetBlue also failed to "analyz[e] the particular job involved and determine its purpose and

14

essential functions," let alone "consult with the individual" to discuss possible accommodations. See Yellow Freight 2002 WL 31011859 at *23. JetBlue, by its own admission, had no "duty/job transition policy" for disabled personnel on leave and assumed without any analysis that flying was an "essential function" of Morse's job, in spite of the fact that Morse had been satisfactorily performing said job without flying for months. Having failed to give any thought to either the actual functions of Morse's job or the particulars of her disability, let alone her numerous requests for a reasonable accommodation, JetBlue simply dismissed her, failing to engage in any interactive process whatsoever.

### B. Morse Could Perform the Essential Functions of the Inflight Supervisor Job, Both Before and After Reorganization

A job function may be considered essential because 1) the reason the position exists is to perform the function; 2) there is a limited number of employees available among whom the performance of that job function can be distributed; or 3) the incumbent in the position is hired for his or her expertise or ability to perform the particular function due to its high degree of specialization. Schroeder v. Suffolk Cty. Comm. Col., No. 07-CV 2060 (JFB)(WDW), 2009 WL 1748869, at *9 (E.D.N.Y. June 22, 2009) (citing 29 C.F.R. § 1630.2(n)(2)).

Evidence of whether a job function is essential includes: 1) the employer's judgment; 2) written job descriptions; 3) the amount of time spent on the job performing the function; 4) the consequences of not requiring the plaintiff to perform the function; 5) the terms of a collective bargaining agreement; 6) the work experience of past employees in the job; and 7) and the work experience of current employees in similar jobs. See Stone v. City of Mount Vernon, 118 F.3d 92, 97 (2d Cir.1997), cert. denied, 522 U.S. 1112 (1998) (citing 29 C.F.R. § 1630.2(n)). "[T]the

15

considerations set out in [the] regulation are fact-intensive. Usually no one listed factor will be dispositive, and the regulations themselves state that the evidentiary examples provided are not meant to be exhaustive." Id. at 97.

"Essential functions" have also been described as "fundamental" duties of the job, Shannon v. N.Y.C. Transit Auth., 332 F.3d 95, 100 (2d Cir. 2003), or, as Inflight Director Cozzie put it, "core" functions. Cozzie conceded that the "core" functions of three of the four reconfigured IS positions did not involve flying. (See above at 3, 4). Thus, it can be fairly stated that in the employer's own judgment, flying was not an essential function of the IS position. JetBlue's assessment of the job's essential functions also was reflected in the job descriptions it drafted. Three of the four IS PEs did not list duties requiring flying as an Essential Function. Moreover, completing flight attendant training no longer was listed as a "Qualification" on the Base Operations PE, meaning that flying also was not required. (See above at 4 ).

In actual practice, both before and after the IS restructuring, supervisors were rarely called upon to fly (see at 3, 4), further indicating that flying was never an "essential function." See Stone, 118 F.3d at 100 (finding that fire suppression activities were "marginal" and not "essential" to certain bureaus within the fire department because even though employees in those bureaus could be called upon to engage in such activities, in reality, they rarely were); Jackson v. City of New York, No. CV 06-1835 (ARM)(MG), 2011 WL 1533471, at *15-16 (E.D.N.Y. Mar. 3, 2011), report and recommendation adopted by 2011 WL 1527935 (Apr. 22, 2011) (holding that diabetic police officer raised issue of fact as to whether patrol duties were an essential function of police officer job where police officers were assigned light duties without patrol for extended periods of time); Felix v. New York City Transit Authority, 154 F. Supp.2d 640, 656 (S.D.N.Y. 2001) ("Given how

16

infrequently office duty Railroad Clerks are actually required to work in the subways each year, and the number of subway duty Railroad Clerks who could fulfill this function, a jury could find that Felix could have been transferred to an office duty position without causing the NYCTA undue hardship."). Flying simply was not a practical reality of the job in 2005 when Morse was still working at JetBlue, or in 2006, when she sought to return to work as a non-flying IS.

Most tellingly, Morse herself worked for seven months as an Inflight Supervisor without flying, and performed her job satisfactorily, again contravening the claim that flying was essential. See Royal v. Anesthesia Group of Onadaga, P.C., 369 F.3d 113, 115-16 (2d Cir. 2004) (employer's accommodation of doctor's request that he be relieved of weekend duty for several months undermined employer's claim that weekend duty was an essential function); Jackson, 2011 WL 1533471 at *15-16 (patrol duty not shown to be essential function where plaintiff herself was assigned to non-patrol duties for almost two years). John Lewis worked as a Systems Operations supervisor from April 2006 to April 2007 without once being required to fly. (See above at 4; Lewis 46:12-18; 49: 8-18). Thus, the "amount of time spent on the job performing the function," "the work experience of past employees in the job" and the "work experience of current employees in similar jobs" all point to the clear fact that flying was not an essential function. See Stone, 118 F.3d at 97.

Finally, there were no "consequences of not requiring the plaintiff to perform the function." See id. The Manager of Inflight and Morse's supervisor prior to the reorganization, Valerie Jenkins, was clear that whenever a supervisor was unable to fly for any reason, another supervisor could replace her without repercussion. (Jenkins 40:8-14; see above at 2).

17

**C.     Completion of Crewmember Training was Not An Essential Function of the Inflight Supervisor Job**

Just as flying was not an essential function of the IS job, neither was completion of flight attendant training. The FAA-mandated training referred to in Def. R.56.1 Stmt ¶ 9, applies to "crewmembers," not to an IS. See 14 CFR § 121.415, "Crewmember and dispatcher training requirements," attached to Cerasia Decl., Ex. O. A supervisor was required to complete recurrent training only if she were to fly with crewmembers. See Def. R.56.1 ¶ 10. Considering that flying was not essential for Morse's position, it follows that neither was completion of flight attendant training. Morse's co-worker, John Lewis, was on dequal status while serving as a Systems Operations supervisor, without adverse consequence to him or the airline. (Lewis 8:19-23; 9:1110:10; 69:2-10).

Defendant cites Kinneary v. City of New York, 601 F.3d 151 (2d Cir. 2010), however the case is easily distinguishable. The plaintiff in Kinneary captained a boat and, due to his disability, was unable to complete drug testing via urinalysis. The Coast Guard accommodated the plaintiff by allowing him to submit a doctor's note indicating whether his medical condition precluded his providing a urine sample; however, the doctor's note produced was non-responsive. Being unable to determine whether plaintiff's medical condition precluded him from completing the urinalysis, the Coast Guard refused to cancel the drug test and revoked plaintiff's licence. Id. at 156-57.

Firstly, being licensed to operate a boat is clearly an essential function of being a boat captain. Secondly, the defendant in Kinneary actually engaged in an interactive process, giving the plaintiff the accommodation of submitting a doctor's note in lieu of taking the urinalysis. In the current case, Morse's disability did not preclude her from performing an essential function of her job – as neither flying nor being qualified to fly were, in fact, essential to being an IS – and defendant clearly failed to provide her with the accommodation she sought.

18

###### D.     The Accommodations Morse Requested Would Not Have Imposed an Undue Burden on JetBlue

An employer has available the affirmative defense that a given accommodation represents an "undue hardship." The affirmative defense requires a detailed showing that the proposed accommodation would "requir[e] significant difficulty or expense" in light of specific enumerated statutory factors. Lovejoy-Wilson, 263 F.3d at 221; see 42 U.S.C. § 12111(10)(A)-(B) (identifying relevant factors to include (1) the employer's type of operation, including its composition, structure, and the functions of its workforce; (2) the financial resources involved in the provision of the reasonable accommodation; (3) the employer's overall financial resources; and (4) the impact of such accommodation upon the employer's operation). The NYSHRL sets forth similar considerations. N.Y. Exec. Law § 296.3(b)(i)-(iii).

JetBlue has presented little to no evidence to suggest that Morse's requested accommodations would have imposed an undue hardship under any of these factors. In his Declaration, Bilak makes unsupported statements about the hardship JetBlue would suffer if Morse's inability to fly were accommodated. But Bilak's statements lack credibility. At his deposition, he contradicted his Declaration, stating that he was not aware of any hardship that JetBlue suffered during the six months Morse worked as an Inflight Supervisor on dequal status. (Bilak 59:11-15). Bilak also testified that he made no effort to discover whether Morse's inability to fly interfered in any way with JetBlue's flight operations. (Id. 60:8-19)

Contrary to Bilak's Declaration, Morse's inability to do check rides posed no trouble for JetBlue. In fact, other supervisors volunteered to do this – a fact not disputed by JetBlue. (Jenkins 41:3-13; Robillard 41:6-9). Jenkins, moreover, testified that supervisors, as a matter of course, would

19

fill in for those unable to fly for any reason. (Id.). Morse's supervisor, Robillard, confirmed that JetBlue suffered no operational hardship due to Morse's inability to fly.  (See above at 1, 2)

Bilak cited as a possible hardship the increased workload of supervisors who had to cover for Morse. (Bilak Decl ¶ 3) Of course, this assumes that Morse would need other supervisors to cover flights for her.  However, as noted, after the restructuring, the IS jobs generally did not involve flying, and thus other supervisors would not have needed to perform any duties in her stead. Even if Morse's accommodation did cause a slight burden on other supervisors, a court "cannot conclude as a matter of law that the burden was so disproportionately heavy as to absolve [JetBlue] from its reasonable accommodation obligations under the ADA." Royal, 369 F.3d at122.  Similarly, defendant cannot meet its burden of proving an undue burden as a matter of law with the cursory assertion that "JetBlue would incur additional costs" as a result of the accommodation.

JetBlue, in short, has failed to meet its burden of demonstrating that Morse's requested accommodations would have represented much of a burden at all, let alone an "undue" one.

### E.    Morse Did Not Seek an Indefinite Leave

JetBlue argues, inexplicably, that Morse, in requesting a reasonable accommodation, actually was seeking an indefinite leave. However, the evidence is clear that by June 2006, Morse had repeatedly requested that she either be able to return to work as an IS, with the accommodation that she need not fly, or be transferred to another available non-flying position.  Even if there were some doubt as to Morse's desire to return to work, JetBlue could easily have resolved the question by engaging in the interactive process with her, as it was required by law to do. Likewise, the argument that plaintiff's receipt of long-term disability benefits and SSDI was evidence that she was seeking an indefinite leave is not a serious one. The record is uncontroverted that Morse told the insurance

carrier that she could return to work in a sedentary job, but that her employer would not let her.  (See above at 9) In addition, Morse, through UNUM, did not even apply for SSDI benefits until July 2007, a year after JetBlue terminated her. (Ex. 16 to Morse [1432-35])

**F.     As an Alternative to Returning Morse to Inflight Supervisor, JetBlue Could Have Re-Assigned Her to Another Job as a Reasonable Accommodation**

JetBlue also could have accommodated Morse by reassigning her to another non-flying position. 42 U.S.C. § 12111(9)(B) (reasonable accommodations may include "reassignment to a vacant position"); Jackan, 205 F.3d at 566. Morse testified that she, in fact, asked Cozzie and Robillard for precisely such a transfer:

> I gave them all my experience; I worked with chairmen of the boards for two major advertising companies in New York, spoke another language, took dictation at 110 words a minute.  I was willing to make a lateral move.  I was willing to accept a lower paying job.  I just couldn't fly. (Morse 181:16-23)

JetBlue argues that Morse cannot identify a vacant position for which she was qualified. This is untrue.  Morse identified vacant Inflight Scheduling and Consumer Services supervisory positions both of which she was qualified for. Defendant concedes that two Supervisor Crew Services positions were open in May 2006 when Morse requested a reassignment, and that JetBlue hired two people, Wilbert Crespo and Erick Capps, for those jobs. (Toppin Decl. ¶¶ 2-4)

In his Declaration, Toppin states that Morse did not meet the Supervisor Crew Services' minimum qualification of four to six years of crew scheduling experience. (Toppin Decl. ¶ 2). However, at his subsequent deposition, Toppin admitted that before making this averment in his Declaration he had not read Morse's employment application which set forth her job duties at positions held before Jet Blue. (Toppin 50:2-7). At his deposition Toppin reviewed Morse's employment application describing her prior job duties and conceded that, contrary to his

21

Declaration, Morse did meet the minimum qualifications for the Supervisor Crew Services job:

> Q.  And in determining whether Ms. Morse met the minimum qualifications of the crew scheduling supervisor job requiring four to six years of crew scheduling experience, do you believe that she had the requisite experience based upon her position and job responsibilities at [her previous job] Aviation Responsibilities:
>
> A.  I would say yes and I'll say that with a slant because I don't see the resume and you're going into the application of a different position and not the application of the crew services supervisor so yes. *To answer your question, yes.*

(<u>Id.</u> 48:10-25) *(emphasis added).[4]*

Just as damning from JetBlue's perspective is Toppin's testimony that, in contrast to Morse, one of the individuals whom JetBlue hired as Supervisor Crew Services, Wilbert Crespo, did *not* meet the position's minimum qualifications. (Toppin 44:23-45:10-25).[5] Once again, Toppin's subsequent deposition testimony directly contradicts the statement in his Declaration that Crespo met the minimum qualifications. (<u>see</u> Toppin Decl. ¶ 3). Therefore, JetBlue's claim that Crespo was "objectively more qualified" for the position than Morse (<u>see</u> Def. R. 56.1 ¶ 49; Def. Mem. of Law 20, 21) is clearly wrong since Morse was qualified for the position and Crespo was not.

Assuming for argument's sake that Crespo and Capps were "objectively more qualified" than

---

[4]      In its revised brief, JetBlue repeats the assertion that Morse lacked the minimum qualifications for Supervisor Crew Services because she would have needed training before starting the job. (Def. R. 56.1 ¶ 49; Mem. of Law at 19, 21) JetBlue's assertion, as noted in the text, is directly contradicted by its own witness, Toppin, the airline's Manager Talent and Acquisition and the official whom defendant selected to opine on the issue. At the very least, Morse's qualifications for the job is a contested issue of fact, one more reason defendant's summary motion should be defeated.

[5]      JetBlue's revised Rule 56.1 Statement is puzzling on this score, stating in paragraph 49, that "Crespo met the minimum qualifications for the job." For authority, defendant cites to Toppin's discredited Declaration.

Morse for the Supervisor Crew Services position, it would not matter. Under JetBlue's own policy, in order to receive a transfer as a reasonable accommodation, Morse only had to show that she met the new job's qualifications, not that she was the *most* qualified. At her deposition, Maguire, the head of People Compliance, described JetBlue's procedure when a disabled employee requested a transfer as a reasonable accommodation:

> ... we'll ensure that she had the minimum qualifications for the job and as long as the job is equal to what she's doing now or even a lower qualified job, then we would tell the recruiters that this person needs an accommodation and if the job is open and they meet the qualifications without any kinds of adjustments then award them the position. (Maguire 46:4-20)

Toppin likewise testified that a disabled employee seeking a reassignment as a reasonable accommodation will be offered the position so long as she meets the position's minimum qualifications and the location is appropriate. (Toppin 19:9-20:17). Since Morse met the minimum qualifications for Supervisor Crew Services and the position was located at her same work site, JFK, she was entitled to be reassigned to the position under JetBlue's reasonable accommodation policy. Had Morse's supervisors referred her reasonable accommodation requests to People Compliance, as JetBlue's ADA policy required them to do (see above at 5, 14), this would have been apparent to JetBlue's People Department and plaintiff would have received the reassignment.

As to the position of Consumer Service Supervisor, Toppin declares that no vacancies existed for this position located at JFK International existed from March 2006 through August 2006. Again, a triable issue of fact exists as to whether a vacancy existed. Morse has testified, contrary to Toppin's statement, that she saw a job posting for the position on the airline's employee intranet, and told Cozzie about it. (See above at 6). Toppin's failure in 2011 to locate a five year-old job posting is

23

hardly determinative of whether such vacancy existed. This is especially true given JetBlue's difficulty in retrieving the information. In response to plaintiff's discovery request for 2006 job postings, JetBlue's counsel wrote, "the retrieval of job postings from 2005 through 2006 has proven difficult and, in most instances, impossible." (See Beranbaum Decl., Ex.16). Thus, JetBlue is in no position to state whether a vacancy for Consumer Service Supervisor existed in 2006.

Moreover, JetBlue has acknowledged that it had vacant out-of-state Customer Service supervisory positions during the period in question. (See Beranbaum Decl. Ex. 17, [JB 08827-52]). Morse would have been willing to relocate, had she been offered one of these positions. (Morse Decl. ¶ 4)

Finally, during the course of discovery, the existence of other vacant positions for which Morse was qualified have come to light. In April 2006, supervisory positions were available in Inflight Services. Inflight Supervisor John Lewis, who had been working part-time, was given his choice of three such Inflight Supervisory positions – Systems Operations, Crewmember Experience or Base Operations (Lewis 32:13-33:20) – from which it can be inferred that there were openings for all three positions. Inflight Director Cozzie admitted that flying was not an essential function for any of these supervisory positions. (See above at 4). Toppin also testified that in 2006 at least one Inflight Supervisor - Systems Operations position was open. (Toppin 51:20-52:4). Indeed, not only were there openings for Inflight Supervisor jobs, JetBlue was experiencing a shortage of people to assume those positions. This is evident from a message on May 3, 2006 from Inflight Manager Dawn Gray to Denise Piccolo, an administrative supervisor who was looking to transfer to another supervisory position: "the [Systems Operation Department] was currently short supervisors and that would be an area that would help the Operation greatly." (Beranbaum Decl., Ex. 17).

24

In addition, in March 2006, three months before the expiration of Morse's leave, JetBlue's Inflight Services was looking to fill a Temporary Duty Analyst position, a desk duty job that Robillard confirmed Morse was qualified for. (Robillard 107:2-108:2; Ex. 28 to Robillard [JB 5675-77]). The position would have lasted up to six months, during which time Morse, with the help of People Compliance, could well have located other positions.

### G.     JetBlue Did Not Reasonably Accommodate Morse for 18 Months

JetBlue did not reasonably accommodate Morse for 18 months, and even if it did, this would not excuse defendant from discriminatorily terminating her. JetBlue asserts that it first accommodated Morse when she was relieved of flying duties while working as an IS. The problem with this argument is that the individual responsible for relieving Morse of flying duties, Valerie Jenkins, testified that she did not consider the adjustment an "accommodation." (Jenkins 93:10-17)

.       Jenkins believed that the requirement that supervisor fly was a loose one, at best, and it was commonplace for one supervisors to fill in for another:

> ...we didn't have any particular number, a quota on how much flying they should do, because at that time it was just suggested that – not suggested, it was a way to forge relationships with their crew member[,] to actually get into their office, because their office is at thirty thousand feet in the air, so there was no set number in terms of how many times they had to fly....[I]f there was a supervisor that was out for whatever reason, we would have other supervisors to monitor their groups. (Id. at 39:20-40:7).

JetBlue also did not reasonably accommodate Morse when it forced her to take involuntary medical leave three months prior to her surgery, despite the fact that she was both willing and able to continue performing her job as she had been for some time. (See above at 3; Morse Decl. ¶ 2; Robillard 80:9-18 [stating that he knew that Morse wanted to continue working until she had the surgery]; Ex. 21 to Robillard [0063]). Morse was significantly disadvantaged by being placed on

25

involuntary disability leave for those three months. Her earnings were reduced substantially and her employee benefits eliminated. (Morse Decl. ¶ 3). Moreover, Morse enjoyed her job and was deprived of the satisfaction she received from it when she was made to go on leave. "I knew I was doing a good job at JetBlue. I knew that I made a difference in the lives of my crew members.  It was satisfying work for me." (Morse 248: 20-23)

The law is clear that an offer of an inferior position, like Morse's placement on disability leave, does not constitute a reasonable accommodation where an available position exists with comparable salary and benefits. Norville v. Staten Island University Hosp., 196 F.3d 89, 100 (2d Cir. 1999) ("Reassignment does not constitute reasonable accommodation...where a position comparable to the employee's former placement is available, but the employee instead is assigned to a position that would involve a significant diminution in salary, benefits, seniority or other advantages that she possessed in her former job"); see also EEOC Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. App. § 1630.2(o) (an employer who utilizes reassignment to meet the duty of reasonable accommodation for a current employee "should reassign the individual to an equivalent position in terms of pay, status, etc., if the individual is qualified, and if the position is vacant within a reasonable amount of time."). When JetBlue placed Morse on involuntary leave, it did not reasonably accommodate her, as it could easily have by allowing her to stay in her current position with her full salary and benefits.

**H.     The Fact that Morse was Not Formally "Cleared" for Work is Irrelevant**

JetBlue seeks to excuse its failure to restore Morse to her job or to reassign her to another on grounds that Morse was not medically cleared to return to work. As an initial matter, JetBlue never requested medical "clearance" from Morse, and has not shown that a policy required it. In any event,

Morse repeatedly represented to JetBlue, when she sought to return to work in June 2006, that she was able and willing to return to work with accommodations and her doctors later testified to the same thing (see above at 9) – which JetBlue would have discovered had it taken the time to engage with Morse in an interactive dialogue before terminating her employment. See Parker v. Columbia Pictures, 204 F.3d 326, 335-36 (2d Cir. 2000) (finding employee's representations to his supervisors that he was capable of returning to work part-time and his physician's later statements as to his ability to return to work sufficient to create a jury question on his reasonable accommodation claim).

## IV.   JETBLUE DISCRIMINATORILY TERMINATED MORSE

JetBlue mistakenly uses the shifting burdens of McDonnell Douglass Corp. v. Green, 411 U.S. 792 (1973), to analyze Morse's discriminatory discharge claim. The proper standard for establishing discriminatory discharge under the ADA is set forth in Parker, 204 F.3d at 332. The Second Circuit held that the employee must show: 1) she was an "individual with a disability" within the meaning of the statute; 2) the employer had notice of her disability; 3) she could perform the essential functions of the job with reasonable accommodation; and 4) the employer refused to make such accommodation.  Id. (citing Stone, 118 F.3d at 96-97); 42 U.S.C. § 12112(b)(5)(B) (defining discrimination as "denying employment opportunities to ... a[n] employee who is an otherwise qualified individual with a disability, if such denial is based on the need of the [employer] to make reasonable accommodation to the physical or mental impairments of the employee").

In Parker, a disabled employee took six months of disability leave. At the end of his leave, the employer fired the plaintiff, not because he was disabled, the employer claimed, but rather because he was unable to return to work at the expiration of his leave. Then Judge Sotomayor,

27

writing for the Second Circuit, found this argument lacking, noting that evidence existed that the plaintiff had requested a return to part-time work while on leave but was ignored. Parker 204 F.3d at 338. The court observed that the defendant failed to engage in the interactive process, and terminated the plaintiff once his leave expired. Id. On these facts, the court vacated the lower court's dismissal of plaintiff's discriminatory discharge claim, writing:

> The duty to make reasonable accommodation does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover, not does it force an employer to investigate every aspect of an employee's condition before terminating him based on his inability to work. *At the very least,* however, an employee who proposes an accommodation while still on short-term leave – as Parker did here, at least two weeks prior to his termination – triggers a responsibility on the employer's part to investigate that request and determine its feasibility. *An employer who fails to do so, and instead terminates the employee based on an exhaustion of leave, has discriminated "because of" disability within the meaning of the ADA.* (Id.) (emphasis added).

Like the defendant in Parker, JetBlue terminated Morse at the expiration of her leave, and makes a similar argument that it did not fire Morse because of her disability, but because she had not returned to work within the leave policy's 52-week deadline. As in Parker, plaintiff here requested a return to work with reasonable accommodation prior to the exhaustion of her leave, and

JetBlue failed "to investigate that request to determine its feasibility." Id. JetBlue chose rather to terminate her. Under Parker, these facts compel a denial of JetBlue's motion for summary judgement as to Morse's discriminatory discharge claim. Id.; cf. Borkowski] v. Valley Central Sch. Dist, 63 F.3d 131, 143 (2d Cir. 1995) ("Failure to consider the possibility of reasonable accommodation for ... disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to a discharge solely because of the disabilities."),

JetBlue appears to argue that it is shielded from liability for Morse's discharge because its

28

52-week leave policy applied to both disabled and non-disabled employees. However, the defendant in <u>Parker</u> had a similar policy that also applied equally to disabled and non-disabled employees.  As in <u>Parker</u>, the apparent neutrality of JetBlue's leave policy did not make it any less duty bound to accommodate Morse or engage her in the interactive process.

JetBlue is correct that in most of the cases cited on pages 12 and 13 of its brief, courts found that an employers' uniformly-applied leave policies did not *per se* violate the ADA. However, the neutrality of the leave policies did not automatically absolve the employers of liability. Rather, in those cases, the courts relied upon other grounds to dismiss the plaintiff's claims, such as the plaintiff's inability to perform the essential functions of the job, the failure to request an accommodation, or lack of proof that she was disabled within the meaning of the ADA.[6] As detailed herein, the facts of this case are completely distinguishable.

------

[6]      See <u>E.E.O.C. v. Beall Concrete Enterprises Inc.</u>, No. 06-Civ-1779, 2008 WL 877769, at *7 (N.D.Tex. March 15, 2008) (plaintiff had medical clearance to return to work, but failed to do so, and was thus not disabled under the ADA); <u>Gantt v. Wilson Sporting Goods Co.</u>, 143, F.3d 1042, 1046 (6th Cir. 1998) (plaintiff never requested that she be allowed to return to work or that she beg given a reasonable accommodation); <u>Benjamin v. Health and Hospitals Corp.</u>, No. 07-CV-2487(KAM)(LB), 2009 WL 2959622, at *10 (Sept. 11, 2009 E.D.N.Y.) (internal citations omitted) (plaintiff could not perform her essential duties at the time of her terminations as she was "unable to return to any gainful employment"); <u>Chasse v. Computer Scis. Corp.</u>, 453 F. Supp.2d 503, 521 (D. Conn. 2006) (plaintiff was unable to return to work at all for 2 to 3 months after her leave expired); <u>Kleiber v. Honda of America Mfg., Inc.</u>, 420 F.Supp. 2d 809, 823-24 (S.D.Oh. 2006) (plaintiff failed to present sufficient evidence that he was "otherwise qualified" to perform his job and there were no vacant positions available); <u>Shafinsky v. Bell Atlantic</u>, 2002 WL 31513551 at *7 (E.D.Pa. Nov. 5, 2002) (plaintiff did not request an accommodation while on leave and there were no positions available); <u>Kolovos v. Sheahan</u>, No. 97 Civ. 4542, 1999 WL 1101919 at *4, 8 (N.D.Ill. 1999) (denying summary judgment for defendant on plaintiff's ADA claim, finding a question of fact as to whether he was disabled and whether defendant had applied its policy in a discriminatory way); <u>Raytheon Co. v. Hernandez</u>, 504 U.S. 44, 51 (2003) (even if the policy was neutral, there was still a fact issue as to whether the stated reason justification for plaintiff's termination was in fact pretext).

Contrary to defendant's analysis, substantial authority exists for a finding that JetBlue's "neutral" 52-week maximum leave policy violated the ADA because its failed to account for the individualized needs of disabled employees on leave. See EEOC Decision (quoted at 8 above)[7]; Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1263 (11th Cir. 2007) ("Allowing uniformly-applied, disability-neutral policies to trump the ADA requirement of reasonable accommodations would utterly eviscerate that ADA requirement") (citing US Airways, Inc. v. Barnett, 535 U.S. 391, 397-98 (2002)); Garcia-Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 647-48 (1st Cir. 2000) (reversing district court's holding that accommodating plaintiff by permitting her medical leave beyond that allowed under the company's policy was unreasonable, and requiring individualized assessment); Hendricks-Robinson v. Excel Corp., 154 F.3d 685, 700 (7th Cir. 1998) (reasonable trier of fact could find that employer's automatic reassignment policy did not fulfill ADA's interactive requirement); Gibson v. Lafayette Manor, Inc., No. 05 Civ. 082, 2007 WL 951473, at *9 (W.D. Pa.. Mar. 27, 2007) (employer's refusal to modify its no-fault leave policy -- terminating employees unable to return to work at the expiration of FMLA leave – violates reasonable accommodation requirement) (citing EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, 2002 WL 31994335 *14 (Oct. 17, 2002)); Yellow Freight, 2002 WL 31011859, at *24 ("This adversarial, rigid adherence to its policy [requiring employee returning

---

[7] The EEOC Determination of probable cause is some evidence of discrimination. See Philbrook v. Ansonia Bd. of Ed., 757 F.2d 476, 481 (2d Cir. 1985) (EEOC probable-cause finding may be used to establish prima facie case), aff'd, 479 U.S. 60 (1986). Field v. Tonawanda City School Dist., 604 F.Supp.2d 544, 555 (W.D.N.Y. 2009), which JetBlue cites, actually held that "[f]indings of discrimination by the EEOC are not admissible evidence, per se, sufficient to avoid summary judgment." In that case, however, the plaintiffs submitted no affidavits or other admissible evidence raising material issues of fact related to any element of their claims. Id. That is plainly not the case here.

30

to work after medical leave to return to his previous job without restrictions] is the antithesis of participation in the interactive process") (inner quotations omitted).

However, for purposes of defeating summary judgment, Morse does not need to prove that JetBlue's leave policy violated the ADA and analogous State and City law. Regardless of the facial validity of defendant's administrative termination policy, a fact question remains whether a) Morse, while still on leave requested an accommodation that would have permitted her to perform the essential functions of the job; and b) JetBlue failed to investigate that request and determine its feasibility, but c) instead terminated her for exhausting her leave -- in which case, defendant would have discriminated against her because of disability within the meaning of the ADA. Parker, 204 F.3d at 338.

## **CONCLUSION**

For the reasons set forth above, defendant JetBlue's Motion for Summary Judgment should be denied in its entirety.

Dated:  New York, New York
        May 25, 2012

                                              Respectfully submitted,

                                              _____s/_____
                                              John A. Beranbaum
                                              Jennifer L. Smith
                                              BERANBAUM MENKEN LLP
                                              80 Pine Street, 33rd floor
                                              New York, NY 10005
                                              ( 212) 509-1616

31