UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X
EMILIE MORSE,

             Plaintiff,         **MEMORANDUM AND ORDER**

    -against-
                               09-CV-5075 (KAM)(MDG)

JETBLUE AIRWAYS CORPORATION,

             Defendant.
------------------------------X

**MATSUMOTO, United States District Judge:**

        Plaintiff Emilie Morse ("Morse" or "plaintiff") is a
former Inflight Supervisor who worked for defendant JetBlue
Airways Corporation ("JetBlue" or "defendant") until her
termination on July 8, 2006.  Plaintiff filed the instant action
on November 19, 2009, alleging that defendant wrongfully
terminated her employment on the basis of her disability and
failed to provide a reasonable accommodation for her disability
in violation of the Americans with Disabilities Act of 1990, 42
U.S.C. §§ 12101 *et seq*. ("ADA"); New York State Human Rights Law
§§ 290 *et seq*. ("NYSHRL"); and New York City Human Rights Law §§
8-101 *et seq.* ("NYCHRL").

        The parties have completed discovery and defendant
moves for summary judgment on grounds that (a) plaintiff is
judicially estopped from asserting her claims; (b) plaintiff's
NYSHRL and NYCHRL claims, and certain of her ADA claims, are
barred by the applicable statutes of limitations; (c) plaintiff

has failed to establish a *prima facie* case that the defendant/employer failed to accommodate her disability; and (d) plaintiff has failed to establish a *prima facie* case of discriminatory discharge.  Plaintiff opposes the motion in its entirety.  For the reasons set forth below, defendant's motion for summary judgment granted in part and denied in part.

## BACKGROUND[1]

Between 2003 and 2006, plaintiff was employed in the Inflight Department of JetBlue as an "Inflight Supervisor." (ECF No. 45, Defendant's 56.1 Statement of Material Facts ("Def. 56.1") ¶¶ 1-2, 38; ECF No. 53, Plaintiff's 56.1 Statement of Material Facts ("Pl. 56.1") ¶¶ 1-2, 38; ECF No. 1, Complaint, ("Compl.") ¶¶ 8-9; ECF Nos. 49-2 & 60-3, Deposition of Emilie Morse ("Morse Dep."), at 9, 212; ECF No. 9, Answer, ¶¶ 8-9; ECF No. 49-3, Morse Dep. Ex. 10.)  The details of plaintiff's employment history at JetBlue and the allegations giving rise to this action are set forth in detail below.

---

[1] The following facts, taken from the parties' statements pursuant to Local Civil Rule 56.1 and the admissible evidence contained in the exhibits cited and annexed to the parties' motion papers, are undisputed unless otherwise indicated.  Insofar as this court relies on facts set forth in defendant's Rule 56.1 Statement, it has done so because plaintiff has either admitted such facts or has not disputed the facts with citations to admissible evidence.  *See Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.").  Where plaintiff presents an evidentiary basis for disagreeing with defendant's characterizations of the cited evidence, the court relies on plaintiff's characterization of the evidence. *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).

I.    **Inflight Supervisor Position**

    **A. Flying Qualification Requirement**

      As an Inflight Supervisor, plaintiff had to complete certain training and become qualified to fly as a flight attendant.  (Def. 56.1 ¶ 8; Morse Dep. 23; Morse Dep. Ex. 1; ECF Nos. 49-6 & 60-5, Deposition of Karen Cozzie ("Cozzie Dep.") at 42, 50-51.)  The requisite qualification training occurred on an annual basis.  At first, to be qualified to fly, plaintiff completed FAA-approved "initial training," which required physical activity and actually flying aboard an aircraft in a "check ride."  (Def. 56.1 ¶ 9; Pl. 56.1 ¶ 9; Morse Dep. at 33-35, 55, 57-50, 99; ECF No. 49-15, Cerasia Declaration ("Cerasia Decl."), Ex. N – Flight Attendant Manual; ECF No. 49-16, Cerasia Decl., Ex. O – Federal Aviation Regulations.)

      Each year thereafter, to remain qualified as a flight attendant, plaintiff was required to complete FAA-mandated "recurrent training," which did not require flying.  (Def. 56.1 ¶¶ 9-10; Pl. 56.1 ¶¶ 9-10; Cerasia Decl. Ex. N; Cozzie Dep. at 51-53, 57; Morse Dep. at 31-35.)  The recurrent training involved a review of evacuation and emergency procedures as well as physical activity, including opening a "pretty heavy" aircraft door; removing a window from its casing and throwing it over the wing of an aircraft; exiting an aircraft via an

emergency slide; and climbing over seats.  (Def. 56.1 ¶ 11; Pl.
56.1 ¶ 11; Morse Dep. at 31-32, 54, 57.)

### B. Position Expectations

#### 1. Pre-April 2006

Until April 2006, the job description - or "Position
Expectations" - for the Inflight Supervisor position included
flying onboard aircrafts and being qualified as a flight
attendant.  (Def. 56.1 ¶¶ 4, 8; Pl. 56.1 ¶¶ 4, 8; ECF No. 49-3,
Morse Deposition Exhibits ("Morse Dep. Ex.") Ex. 1.)
Specifically, the Inflight Supervisor Position Expectations
included the following "essential functions":  "Completes in-
flight observations and evaluate[s] Inflight Crewmembers on a
consistent basis"; "Ensures understanding of job-related
information by observing Inflight Crewmembers on duty"; and
"Works in-flight as a qualified Flight Attendant as needed."
(Def. 56.1 ¶ 4; Morse Dep. Ex. 1; Morse Dep. at 15-17, 69.)

Morse supervised a group of seventy-five to eighty of
JetBlue's flight attendants, or Inflight Crewmembers
("Crewmembers"), and she was responsible for assessing their
performance during flights on "check rides" by observing their
teamwork and interactions with passengers, and ensuring that

Crewmembers knew how to operate the aircraft's emergency equipment.[2]  (Def. 56.1 ¶ 5; Morse Dep. at 15-17, 69.)

In approximately March or April 2005, JetBlue began to require Inflight Supervisors to fly at least twenty hours per month.  (Def. 56.1 ¶ 7; Morse Dep. at 19.)  Although plaintiff does not dispute the twenty-hour flight requirement for Inflight Supervisors, she claims that it was not enforced in practice, noting that at least three Inflight Supervisors continued to work as Inflight Supervisors for extended periods of time without flying:  (1) the plaintiff herself, between December 2004 and July 2005; (2) Denise Piccolo, between January 2004 and May 2005; and (3) John Lewis, between April 2006 and April 2007.[3] (Pl. 56.1 ¶¶ 7-8; Morse Dep. at 46-47, 72, 102, 110-11; ECF No. 60-5, Deposition of Denise Piccolo ("Piccolo Dep.") at 30-31, 35-36, 39, 41; ECF No. 60-6, Deposition of John Lewis ("Lewis Dep.") at 46.)

_____

[2] Plaintiff contends that for an eight-month period between December 2004 to July 2005, she was "neither required to fly nor [required to] observe the flight attendants who reported to her during flights." (Pl.'s 56.1 ¶ 5.)  The admissible evidence to which plaintiff cites, however, indicates that during that eight-month period, plaintiff *did not fly*, but she was required to fly and to observe the Crewmembers under her supervision. (Morse Dep. at 46-47, 110-11.)

[3] Morse contends that "[o]f the 19 other Inflight Supervisors working for JetBlue out of JFK between January 2005 and December 2006, 7 flew less than once a month and none flew more than three times a month, on average."  (Pl.'s 56.1 ¶ 7 (citing ECF No. 55, Declaration of Julianne Coates ("Coates Decl.").)  While Coates' Declaration contains data to support plaintiff's conclusion regarding the flying frequency of certain JetBlue employees, the declaration does not indicate that the employees in her data set were indeed Inflight Supervisors.  Accordingly, the court does not rely on this data.

Approximately two years after plaintiff joined
JetBlue, defendant's policies changed and Inflight Supervisors
no longer flew as passengers on "check rides"; instead, when
they flew, they worked as part of the working crew and performed
tasks alongside Inflight Crewmembers.  (Def. 56.1 ¶ 6;[4] Pl. 56.1
¶ 6; Morse Dep. at 17.)

### 2. Post-April 2006

In approximately April 2006, JetBlue divided the
functions of the Inflight Supervisor position among four newly
created Inflight Supervisor positions:  (1) Crewmember
Experience; (2) Base Operations; (3) Systems Operations; and (4)
Onboard Experience.  (Pl. 56.1 ¶ 33; Cozzie Dep. at 20-26;
Cozzie Dep. Exs. 4 & 6.)  Although the core functions of the
first three teams did not include flying, "all supervisors flew
at some point, or [were] required to be a qualified flight
attendant regardless if it was their day-to-day duty or not."
(Pl. 56.1 ¶ 33; Cozzie Dep. at 24, 42-51.)

The Position Expectations for the "Inflight
Supervisor, Base Operations" position indicated that the
position "require[d] strenuous physical work," including
"[h]eavy lifting, pushing or pulling of objects up to 100 pounds
occasionally and/or up to 50 pounds frequently."  (Cozzie Dep.

---

[4] Defendant's 56.1 Statement asserts that this change occurred
between the end of November 2003 and December 2004, but the record citation
does not support that assertion.

Ex. 6.)  The Position Expectations for the "Inflight Supervisor,
Systems Operations" position included the "ab[ility] to cover
trips away from base overnight" and "willing[ness] to fly trips
when required by [irregular operation] situations."[5]  (Lewis Dep.
Ex. 2.)

## II.  Plaintiff's Employment History at JetBlue

Plaintiff began working for JetBlue in November 2003
as an Inflight Supervisor.  (Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1; Morse
Dep. At 9; Compl. ¶ 9; Answer ¶ 9.)  Shortly thereafter, Morse
completed initial training to become qualified as a flight
attendant.  (Def. 56.1 ¶ 8; Pl. 56.1 ¶ 8; Morse Dep. at 30.)

Plaintiff acknowledges that "observing flight
attendants flying" was an "important" part of her job as an
Inflight Supervisor, and that some of the tasks listed as
"essential functions" on the Inflight Supervisor job description
involved flying on airplanes.  (Pl. 56.1 ¶ 4; Morse Dep. at 25-
26, 69.)  Nevertheless, plaintiff asserts that in practice, the
flying-related functions were not "essential" to the Inflight
Supervisor position, because she "never flew a lot" during the
period between November 2003 and December 2004.  (Pl. 56.1 ¶ 4;
Morse Dep. at 25-26, 69.)  During that period, plaintiff and her
fellow Inflight Supervisors flew onboard airplanes only when

---

[5] Lewis testified, however, that he performed all of the
"Essential Functions" of the position, and that none of them required flying.
(Lewis Dep. at 46, 49.)

they were conducting "check rides" to observe Crewmembers as they worked on a flight. (Def. 56.1 ¶ 4; Pl. 56.1 ¶ 4; Jenkins Dep. at 14; Morse Dep. at 69.) Plaintiff estimates that at most, she flew approximately twelve times in a month as an Inflight Supervisor. (Def. 56.1 ¶ 6; Morse Dep. at 25-26.)

### A. Relief from Flying Duties

Plaintiff was scheduled to complete recurrent training in November 2004, after her first full year at JetBlue; however, she did not attend the training because she had started to experience back problems. (Def. 56.1 ¶ 12; Pl. 56.1 ¶ 12; Morse Dep. at 33-35, 47, 236; Compl. ¶ 14.) Shortly thereafter, in approximately December 2004, plaintiff's doctor informed her that she was unable to fly. (Def. 56.1 ¶ 30; Pl. 56.1 ¶ 30; Morse Dep. at 60-61, 335-36.) At that time, plaintiff asked Valerie Jenkins ("Jenkins"), who was then-Manager of Inflight and plaintiff's supervisor, if she required plaintiff to furnish medical documentation to substantiate her inability to fly. Jenkins declined and took plaintiff at her word and informally relieved Morse of her flying requirements due to plaintiff's health problems. (Def. 56.1 ¶ 13; Pl. 56.1 ¶ 13; Morse Dep. at 24, 26-27, 68.) Jenkins also told plaintiff that her health came first, and encouraged plaintiff to recover before worrying about fulfilling her recurrent training requirements. (Def. 56.1 ¶ 13; Pl. 56.1 ¶ 13; Morse Dep. at 35, 52, 94.)

Consequently, in approximately January 2005, Morse stopped flying altogether because JetBlue relieved plaintiff of her flying duties. (Def. 56.1 ¶ 14; Pl. 56.1 ¶ 4, 14; Morse Dep. at 46-47; 62, 72, 102, 110-11.) As a result, other Inflight Supervisors performed the "check rides" of flight attendants who reported to plaintiff. (Def. 56.1 ¶ 15; Pl. 56.1 ¶ 15; Morse Dep. at 63-64.) Plaintiff contends that a number of younger Inflight Supervisors who "loved the opportunity to fly to different cities volunteered" to perform the check rides for plaintiff. (Pl. 56.1 ¶ 15; Morse Dep. at 63, 65.) Plaintiff also maintains that even though she did not fly, she continued to perform all other functions of her position as an Inflight Supervisor. (Pl. 56.1 ¶ 4; Morse Dep. at 46-47; 72, 102, 110-11.)

### B. "Dequal" Status

Because plaintiff was unable to fly and could not complete recurrent training, she fell into "dequal" status in approximately January 2005 and was no longer qualified to perform the duties of a flight attendant. (Def. 56.1 ¶ 16; Pl. 56.1 ¶ 16; Morse Dep. at 54-55.)[6] As of July 2005, plaintiff would have had to fly in an aircraft in order to become

---

[6] After remaining in "dequal" status for more than one year, under FAA regulations, plaintiff would have had to complete initial training again in order to be qualified to fly again. (Def.'s 56.1 ¶ 17; Pl.'s 56.1 ¶ 17; Morse Dep. at 55, 99; Morse Dep. Ex. 2.)

requalified.  (Def. 56.1 ¶ 18; Pl. 56.1 ¶ 18; Morse Dep. at 93;
Morse Dep. Ex. 2.)  Plaintiff's doctor never cleared her to fly
or to complete such training, however.[7]  (Def. 56.1 ¶ 18; Pl.
56.1 ¶ 18; Morse Dep. at 53–54, 93.)

     To this day, plaintiff has not presented to JetBlue
any physician's note indicating that she has been medically
cleared to fly.  (Def. 56.1 ¶ 30; Pl. 56.1 ¶ 30; Morse Dep. at
60, 335–36.)  Plaintiff claims that she asked Jenkins whether
she should procure a clearance note from a doctor, and Jenkins
said it was unnecessary and that Jenkins would rely on
plaintiff's representations regarding her ability to fly.  (Pl.
56.1 ¶ 30; Morse Dep. at 60–61, 93–94.)

### C. Disability Leave and Administrative Termination

     On June 24, 2005, Scott Robillard ("Robillard"),
plaintiff's Inflight Manager at the time, informed plaintiff
that she was failing to meet the minimum qualifications of an
Inflight Supervisor because she had been dequalified as a flight
attendant for nearly six months, since January 1, 2005.  (Def.

---

[7] The parties disagree as to who bore the responsibility of
requesting clearance from plaintiff's doctor regarding plaintiff's ability to
fly.  Defendant claims that Jenkins did not permit plaintiff to attend
recurrent training in or about June or July 2005 because "[Plaintiff's]
doctor would not permit her to fly, and [plaintiff] never asked her doctor to
provide a note stating that she could fly."  (Def.'s 56.1 ¶ 19; Morse Dep. at
95, 100–01, 123–24.)  Plaintiff, on the other hand, asserts that Jenkins did
not permit plaintiff to attend recurrent training because she was concerned
about JetBlue's potential liability in the event that plaintiff hurt herself
during such training, and plaintiff did not provide a doctor's note regarding
her ability to fly because JetBlue did not request one and Jenkins told her a
doctor's note was not necessary.  (Pl.'s 56.1 ¶ 19; Morse Dep. at 52, 60–61,
93–94, 101.)

56.1 ¶ 20; Pl. 56.1 ¶ 20; Morse Dep. at 27, 106; Morse Dep. Exs. 2 & 3.)  Consequently, Robillard offered three options to Morse on June 24, 2005:  (1) "Enter the next training class to become re-qualified"; (2) "Contact the Benefits Department to explore potential leave options"; and (3) "Contact your Crewleader to request a 30-day unpaid leave of absence."  (Def. 56.1 ¶ 21; Pl. 56.1 ¶ 21; Morse Dep. at 106, 108; Morse Dep. Ex. 3.)  Robillard also informed plaintiff that if she did not requalify as a flight attendant or consider either of the other two options by July 7, 2005, she could be administratively terminated.  (Def. 56.1 ¶ 21; Pl. 56.1 ¶ 21; Morse Dep. Ex. 3.)

        Morse informed Robillard and Jenkins that the first option - taking the next training class to requalify under FAA regulations - was "NOT an option and in fact, was disallowed . . . by [Jenkins]" because plaintiff had not been medically cleared to fly.  (Def. 56.1 ¶ 22; Pl. 56.1 ¶ 22; Morse Dep. at 106-07, 111-12, 236; Morse Dep. Ex. 3.)  Morse also refused the third option - a thirty-day unpaid leave of absence - because she needed more than thirty days to recover from a back surgery that was then scheduled to take place on July 7, 2005.  (Def. 56.1 ¶ 23; Pl. 56.1 ¶ 23; Morse Dep. at 107, 114-15, 123; Morse Dep. Ex. 3.)

        According to defendant, plaintiff conferred with JetBlue's Benefits Department and ultimately chose to take a

11

short-term disability ("STD") leave of absence effective July 7, 2005.  (Def. 56.1 ¶ 24; Pl. 56.1 ¶ 24; Morse Dep. at 41, 62-63, 118-19, 123, 236.)  Plaintiff disputes that this was a "choice" that she made; in her view, defendant "forced" her to accept the STD leave by refusing to provide a fourth option, to continue working with an accommodation, which plaintiff requested and would have chosen had it been granted.  (Pl. 56.1 ¶ 24; Morse Dep. 114, 120, 122.)  Between June 2005 and July 7, 2005, the only accommodation that plaintiff requested was permission to continue working as an Inflight Supervisor without flying duties.  (Def. 56.1 ¶ 26; Pl. 56.1 ¶ 26; Morse Dep. at 133-34.)

Plaintiff's surgeon, Dr. Frank Cammisa, Jr., performed surgery on plaintiff's back on October 12, 2005.[8]  (Def. 56.1 ¶ 25; Morse Dep. at 50-51.)

### 1. JetBlue Termination Policy

When plaintiff began her STD leave on July 7, 2005, JetBlue maintained a 52-week administrative termination policy (the "JetBlue Termination Policy") which provided, in relevant part:

> Should a Crewmember not return from any leave discussed in this section at the end of the authorized period, the Crewmember may

---

[8] Defendant's 56.1 statement states that "[plaintiff's] surgeon, Dr. Frank Cammisa, who first saw her on July 8, 2005, advised her to stop working as of July 19, 2005."  (Def.'s 56.1 ¶ 25.)  Because none of the accompanying record citations support this statement, the court does not regard it as an undisputed fact supported by admissible evidence.

> be considered as having voluntarily resigned
> or may be administratively terminated,
> unless otherwise required by law.   Any
> JetBlue Crewmember who exceeds 52 weeks of
> time off in a rolling 24-month period may be
> considered to have abandoned their job
> and/or be administratively terminated. . . .
> Crewmembers must be able to perform all
> essential functions of their position upon a
> return to work.   If that is not possible the
> Crewmember may be eligible to request an ADA
> (Americans with Disabilities Act)
> accommodation.

(Def. 56.1 ¶ 28; Pl. 56.1 ¶ 28; Morse Dep. at 12, 169; Cozzie

Dep. at 119; Morse Dep. Ex. 7.)   Although defendant asserts that

Jetblue's Termination Policy was applied uniformly to both

disabled and non-disabled employees (see Def. 56.1 ¶ 29; ECF No.

48, Declaration of Robert Bilak ("Bilak Decl.") at ¶ 2),

plaintiff submits evidence disputing the uniform application of

the JetBlue Termination Policy, noting that the EEOC determined

that JetBlue had "maintained an inflexible 52-week maximum leave

policy . . . that create[d] a pattern or practice of denying

reasonable accommodation to, and discriminating against, a

nationwide class of individuals with disabilities in violation

of the ADA from at least March 2004 to [November 2008]."  (Pl.

56.1 ¶ 29; EEOC Determination.)

## 2. Expiration of Plaintiff's 52-Week Leave of Absence

As of April 6, 2006, plaintiff's return-to-work date remained "indefinite."  (Def. 56.1 ¶ 30; Morse Dep. at 335-36.) Dr. Frank Cammisa, opined that:

> [Plaintiff] cannot return to work.  She is 100 percent totally disabled. The patient's job requires her to fly on airplanes frequently and she is unable to do that.

(Def. 56.1 ¶ 31; Pl. 56.1 ¶ 31; Dr. Cammisa Dep. at 34-36; Dr. Cammisa Dep. Ex. 2.)  The above opinion by Dr. Cammisa was based on the understanding that plaintiff was a flight attendant, and he was unsure as to whether plaintiff could ever return to work as a flight attendant.  (Def. 56.1 ¶ 31; Pl. 56.1 ¶ 31; Dr. Cammisa Dep. at 34-37.)

### a. Request for Accommodation: Inflight Supervisor With Relief from Flying

On several occasions in June 2006, one month before her 52-week leave of absence was set to expire, Robillard called and emailed plaintiff to find out "if there [was] anything [JetBlue could] do to support [plaintiff's] return to work." (Def. 56.1 ¶ 32; Pl. 56.1 ¶ 32; Morse Dep. at 183; Cozzie Dep. at 70-73; Cozzie Dep. Ex. 8; Robillard Dep. at 93, 96-97; Robillard Dep Exs. 10, 24.)  At that time, plaintiff was still physically unable to fly, assist boarding passengers with their luggage, or respond to emergency situations.  (Def. 56.1 ¶ 33;

Pl. 56.1 ¶ 33; Morse Dep. at 181-82.)  Although defendant
asserts that there was no Inflight Supervisor position at
JetBlue that did not require flying (Def. 56.1 ¶ 34; Morse Dep.
at 185-86), plaintiff submitted evidence, discussed supra
Section I.B.2, that in April 2006, the Inflight Supervisor
position was reconfigured into four newly created positions,
three of which did not include flying as a core function (Pl.
56.1 ¶ 33; Cozzie Dep. at 20-26; Cozzie Dep. Exs. 4, 6).

        In any event, Morse asked to return to work as an
Inflight Supervisor with an accommodation in the form of
permanent relief from flying duties.  (Def. 56.1 ¶ 34; Pl. 56.1
¶ 33; Morse Dep. at 181-86, 240, 245.)  Specifically, on June 9,
2006, plaintiff asked Robillard if JetBlue could "restructure
[her] job, i.e., eliminate the flying" from her position as an
Inflight Supervisor.  (Def. 56.1 ¶ 33; Pl. 56.1 ¶ 33; Morse Dep.
at 181; Cozzie Dep. at 74; Cozzie Dep. Ex. 8.)  She also sought
this accommodation from Cozzie, then-Director of Inflight and
Robillard's supervisor, and represented to Robillard and Cozzie
that she was able to work full-time and perform the other duties
she performed before her leave, apart from flying.  (Pl. 56.1 ¶
33, 46; Morse Dep. at 180-86, 194.)

        On June 30, 2006, Cozzie informed Morse that JetBlue's
"current (and past) [Position Expectations] require that all
Supervisors are qualified [Inflight Crewmembers]."  (Cozzie Dep.

                              15

98-99, 111; Cozzie Dep. Ex. 8.)  During that conversation,
Cozzie also informed Morse that her administrative termination
would be effective July 8, 2006.[9]  (Def. 56.1 ¶ 35; Pl. 56.1 ¶
35; Cozzie Dep. at 98; Cozzie Dep. Ex. 8.)  Morse also asked
Cozzie whether she had spoken to anyone in JetBlue's People
(Human Resources) Department to find out whether Morse could be
accommodated in any way, and Cozzie said that the People
Department could not help Morse.  (Pl. 56.1 ¶ 46; Morse Dep. at
189.)

### b. Request for Accommodation: Lateral Positions at JetBlue

In June 2006, Morse also asked Robillard to be
transferred to another position within JetBlue, and expressed
her willingness to make a lateral move or accept a lower-paying
job.  (Pl. 56.1 ¶¶ 33, 46; Morse Dep. at 181-184.)  She
reiterated that the only thing she could not do was fly.  (Pl.
56.1 ¶ 46; Morse Dep. at 181.)

Morse identified two open positions listed on
JetBlue's intranet for which she was qualified or could perform
with training: (1) Customer Service and (2) Inflight Scheduling.
(Def. 56.1 ¶ 46; Pl. 56.1 ¶¶ 33, 46; Morse Dep. at 181-84, 186,
270.)

---

[9] The actual effective date of JetBlue's termination of Morse's
employment was July 12, 2006.  (Def.'s 56.1 ¶ 38; Pl.'s 56.1 ¶ 38; Morse Dep.
at 212; Morse Dep. Ex. 10.)

Defendant asserts that between March 2006 and August 2006, there were no job vacancies for a Customer Service Supervisor position at JFK International Airport, and admits that it has had difficulty retrieving records of vacancies from that period.  (Def. 56.1 ¶ 47; ECF No. 47, Declaration of Jonathan Toppin ("Toppin Decl.") ¶ 5; Beranbaum Decl. Ex. 16 at 2.)  Plaintiff maintains, however, that she saw a job listing on the company's intranet for a customer service job at JetBlue when she sought to return to work in July 2006.  (Pl. 56.1 ¶ 47; Morse Dep. at 183.)

JetBlue's Manager of Talent Acquisitions, Jonathan Toppin ("Toppin"), confirmed that JetBlue had two vacant Supervisor Crew Services (also known as "Inflight Scheduling") positions in Forrest Hills, New York, in May 2006.  (Def. 56.1 ¶ 48; Toppin Decl. ¶ 2.)  These positions required four to six years of scheduling experience.  (Def. 56.1 ¶ 48; Toppin Decl. ¶ 2.)  Wilbert Crespo ("Crespo") and Erick Capps ("Capps") were promoted to fulfill the two vacancies in Supervisor Crew Services on June 7 and 13, 2006, respectively.  (Def. 56.1 ¶¶ 49-50; Toppin Decl. ¶¶ 3-4.)

Toppin initially claimed in a declaration to have reviewed plaintiff's resume and work history before determining that "she does not meet the minimum qualifications for these positions."  (Toppin Decl. ¶ 2.)  At deposition, however, Toppin

17

admitted that at the time he signed his Declaration, he had not read plaintiff's employment application. (ECF No. 83-24, Deposition of Jonathan Toppin ("Toppin Dep.") at 50.) Upon review of Morse's original employment application to JetBlue, which described Morse's prior job experience in the airline industry, Toppin conceded that Morse met the minimum qualifications for the Supervisor Crew Services position. (*Id.* at 48.)

Plaintiff did not apply for either of these positions, or any other vacant position at JetBlue, however, because she was an "inactive employee" on a leave of absence, and therefore unable to apply for any open position until she had returned to work. (Def. 56.1 ¶ 46; Pl. 56.1 ¶ 46; Toppin Decl. ¶ 6; Morse Dep. at 184, 186-88.) Because plaintiff could not apply directly for the jobs, she asked Cozzie to investigate, on plaintiff's behalf, whether the jobs were still available, but Cozzie responded to Morse that "she really didn't find anything." (Def. 56.1 ¶ 46; Pl. 56.1 ¶ 46; Morse Dep. at 188-89.)

Additionally, JetBlue's personnel policy regarding Crewmembers who wished to transfer between departments required that any applicant who was on a leave of absence other than a personal leave of absence "must have all required release documentation such as a physician's release to full duty for the

18

desired position, if necessary." (Morse Dep. Ex. 12 at Section
C.2 (emphasis omitted).) JetBlue's policy is also clear that
Crewmembers returning to work from STD must provide their
supervisor with "a completed Medical Return to Work
authorization form." (*Id.* Ex. 7 at Section G.4.2.) It is
unclear on the face of JetBlue's policy, however, what
procedure, if any, is required in order for Crewmembers to
return to work from long-term disability ("LTD"). (*Compare id.*,
regarding procedure for Crewmembers to return to work from STD,
*with id.* at Section G.5, regarding LTD generally, but not
delineating a procedure for Crewmembers to return to work from
LTD.)

### 3. Plaintiff's Termination of Employment

On July 8, 2006, JetBlue terminated plaintiff's
employment, and Cozzie informed plaintiff that she could reapply
for a position at JetBlue. (Def. 56.1 ¶ 35; Morse Dep. at 196-
97; Cozzie Dep. Ex. 8.) Plaintiff chose not to reapply for
employment at JetBlue, however, "[i]n light of the way [she] was
treated." (Def. 56.1 ¶ 35; Morse Dep. at 197.)

In October 2006, Dr. Cammisa certified that plaintiff
was "100 percent totally disabled" and "unable to return to
work." (Def. 56.1 ¶ 39; Morse Dep. at 157; Cammisa Dep. at 41-
42; Cammisa Dep. Ex. 3.) He also certified that she could not

"fly [or] stand for prolonged periods."  (Def. 56.1 ¶ 39;
Cammisa Dep. at 44; Cammisa Dep. Ex. 3.

        Plaintiff collected STD benefits for six months,
beginning one week after she went on a leave of absence in July
2005.  (Def. 56.1 ¶ 40; Pl. 56.1 ¶ 40; Morse Dep. at 161.)

        In January 2006, plaintiff began to receive LTD
benefits from First Unum Life Insurance Company ("Unum").  (Def.
56.1 ¶ 40; Pl. 56.1 ¶ 40; Morse Dep. at 161.)  Under JetBlue
guidelines, to be eligible for LTD benefits during the first
twenty-four months of the Crewmember's purported disability, a
Crewmember must be "completely unable, because of illness or
injury, to perform every duty related to his or her job."  (Pl.
56.1 ¶ 41; Morse Ex. 7.)  To receive LTD benefits thereafter,
the Crewmember must be "unable to work in any occupation for
which he or she is reasonably qualified through training,
education, or experience."  (Morse Ex. 7.)

        Similarly, under Unum's guidelines, an individual is
"disabled" when she is "limited from performing the material and
substantial duties of [her] regular occupation due to [her]
sickness or injury" and "[she has] a 20% or more loss in [her]
indexed monthly earnings due to the same sickness or injury."
After the first twenty-four months, Unum considers an individual
to be "disabled" if she is "unable to perform the duties of any
gainful occupation for which [she is] reasonably fitted by

                          20

education, training or experience." (Def. 56.1 ¶ 41; Pl. 56.1 ¶ 41; Cerasia Decl. Ex. P; Beranbaum Decl. Ex. 11.) As of June 2010, Morse had been receiving LTD benefits for more than four-and-one-half years. (Def. 56.1 ¶ 41; Pl. 56.1 ¶ 41; Morse Dep. at 162.)

### 4. Social Security Benefits

As a condition of her continuing receipt of LTD benefits from Unum, Morse applied to the Social Security Administration (SSA) for Social Security Disability Insurance (SSDI) benefits on July 16, 2007, and began to collect SSA benefits thereafter. (Def. 56.1 ¶ 42; Pl. 56.1 ¶ 42; Morse Dep. at 163-64, 279.) In her August 30, 2007 application for SSA benefits, plaintiff certified under oath that she "became unable to work because of [her] disabling condition on July 8, 2005." (Def. 56.1 ¶ 42; Cerasia Decl. Ex. Q.) Plaintiff subsequently received an SSA determination finding her disabled as of July 8, 2005. (Def. 56.1 ¶ 42; Morse Dep. at 278; Morse Dep. Ex. 16.)

### D. Treatment of Other Employees

In support of her disability discrimination claim, plaintiff asserts that JetBlue accommodated two other employees, John Lewis ("Lewis") and Denise Piccolo ("Piccolo"), by allowing them to work as Inflight Supervisors in a non-flying, administrative capacity, and despite not being qualified as

21

inflight crew members.  (Def. 56.1 ¶ 52; Pl. 56.1 ¶¶ 8, 52;
Morse Dep. at 73-74, 199-201, 238-39; Compl. ¶ 17.)

### 1. John Lewis

John Lewis had been an Inflight Supervisor for JetBlue
for approximately three years when he took a leave of absence to
recover from life-threatening injuries he sustained in an on-
the-job car accident in June 2005.  (Def. 56.1 ¶ 53; Pl. 56.1 ¶
53; Lewis Dep. at 7, 10-11, 102-03.)  He became dequalified from
flying in September 2005.  (Def. 56.1 ¶ 54; Pl. 56.1 ¶ 54; Lewis
Dep. at 105.)

Lewis returned to work at JetBlue in January 2006,
approximately seven months after the accident.  (Def. 56.1 ¶ 54;
Pl. 56.1 ¶ 54; Lewis Dep. at 8.)  At that time, he had been
dequalified from flying for approximately four months.  (Def.
56.1 ¶ 54; Pl. 56.1 ¶ 54; Lewis Dep. at 106.)  Even though Lewis
was unable to perform all of his job duties, including flying,
he retained his title of "Inflight Supervisor," but he reported
to the Director of Inflight Recruitment.  (Def. 56.1 ¶ 55; Pl.
56.1 ¶ 55; Lewis Dep. at 8, 21, 27, 106.)

Upon his return to work, Lewis worked "part-time in
extreme" at his doctor's suggestion, by working only two to four
hours a day.  (Def. 56.1 ¶ 55; Pl. 56.1 ¶ 55; Lewis Dep. at 22.)
During the following months, doctors gradually permitted Lewis
to work additional hours until he was able to sustain an eight-

hour-per-day schedule.  (Def. 56.1 ¶ 55; Pl. 56.1 ¶ 55; Lewis
Dep. at 22.)

        In April 2006, Lewis was medically cleared to resume
full supervisory responsibilities and to take on a full
schedule, and he began working as an Inflight Supervisor –
System Operations.  (Def. 56.1 ¶ 56; Pl. 56.1 ¶ 56; Lewis Dep.
at 9-10, 32-35.)  He worked in that position while dequalified
for one month.  (Def. 56.1 ¶ 56; Pl. 56.1 ¶ 56; Lewis Dep. at
69-70.)  JetBlue then informed Lewis that, in order to maintain
his Inflight Supervisor position, he would have to become
requalified.  (Def. 56.1 ¶ 57; Pl. 56.1 ¶ 57; Lewis Dep. at 71.)
Lewis completed recurrent training in May 2006, approximately
five months after returning to work and less than one year after
he was placed in dequalification status.  (Def. 56.1 ¶ 57; Pl.
56.1 ¶ 57; Lewis Dep. at 70-71.)

### 2. Denise Piccolo

        Between January 2001 and approximately January 2002,
Denise Piccolo held the position of Inflight Supervisor.  (Def.
56.1 ¶ 58; Pl. 56.1 ¶ 58; Piccolo Dep. at 7-9.)  In January
2002, she was promoted to the position of Administrative
Supervisor, in which she oversaw Inflight Supervisors in
addition to crew members.  (Def. 56.1 ¶ 58; Pl. 56.1 ¶ 58;
Piccolo Dep. at 9.)  That promotion came with increased
administrative duties, and Piccolo testified that, as a result,

her flying duties were "reduced or diminished" because her administrative work alone took 14 hours, "so there really wasn't much time to fly." (Piccolo Dep. at 42.) Additionally, although Piccolo was required to fly "as needed," she was on "dequal status" between July 2004 and May 2005. (Def. 56.1 ¶ 58; Pl. 56.1 ¶ 58; Piccolo Dep. at 9-10, 30-31, 35-37.) Piccolo relinquished her responsibilities as an Administrative Supervisor in 2005 or 2006, and her responsibilities were dispersed throughout the department because no one took over the position. (Def. 56.1 ¶ 58; Pl. 56.1 ¶ 58; Piccolo Dep. at 16-17.)

### III. The Instant Action

On November 16, 2006, Morse filed a charge of discrimination against JetBlue with the United States Equal Employment Opportunity Commission (the "EEOC"), alleging claims of disability discrimination as a result of the JetBlue Termination Policy. (Def. 56.1 ¶ 59; Pl. 56.1 ¶ 59; Compl. ¶ 4.) Two years later, on November 6, 2008, the EEOC issued a determination, concluding that JetBlue violated the ADA by failing to effectively engage in an interactive process with plaintiff; failing to provide her with a reasonable accommodation; and terminating her employment pursuant to an "inflexible 52-week maximum leave policy." (Pl. 56.1 ¶ 3; ECF 60-1, Declaration of John A. Beranbaum ("Beranbaum Decl."), Ex.

24

1, EEOC Determination.)  The EEOC also found that by inflexibly applying its 52-week maximum leave policy to individuals with disabilities, JetBlue maintained a "pattern or practice of denying reasonable accommodation to, and discriminating against a nationwide class of individuals with disabilities in violation of the ADA."  (Pl. 56.1 ¶ 3; Beranbaum Decl., Ex. 1.)

On November 19, 2009, plaintiff filed the instant action.  (Def. 56.1 ¶ 60; Pl. 56.1 ¶ 60; *see generally* Compl.)

## DISCUSSION

### I.   Summary Judgment Standard

"Summary judgment is appropriate where there is no genuine dispute as to any material fact and the record as a whole indicates that no rational factfinder could find in favor of the non-moving party." *Graves v. Finch Pruyn & Co.*, 353 Fed. Appx. 558, 560 (2d Cir. 2009) ("*Graves II*") (citing *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)).  "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir. 2007) (quotation marks omitted).  "A fact is material when it might affect the outcome of the suit under governing

25

law." *Id.* (internal quotation marks omitted).  Moreover, an

issue of fact is genuine only if "the evidence is such that a

reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"In order to defeat a motion for summary judgment

supported by proof of facts that would entitle the movant to

judgment as a matter of law, the nonmoving party is required

under Rule 56[] to set forth specific facts showing that there

is a genuine issue of material fact to be tried." *Ying Jing Gan*

*v. City of New York,* 996 F.2d 522, 532 (2d Cir. 1993).  The

nonmoving party may not, however, "rely simply on conclusory

statements or on contentions that the affidavits supporting the

motion are not credible, or upon the mere allegations or denials

of the nonmoving party's pleading."  *Id.* at 532–33.

## II.  Judicial Estoppel

Defendant first argues that plaintiff should be

"judicially estopped from maintaining her disability

discrimination claims" because she applied for, received, and

continues to receive SSDI and LTD benefits upon certifying to

the SSA and Unum that she is "disabled" and "unable to work."

(ECF No. 46, Defendant's Memorandum of Law in Support of Its

Motion for Summary Judgment ("Def. Mem.") at 5.)

Judicial estoppel applies when a party makes

contradictory statements during the course of legal or

administrative proceedings.  *See Bates v. Long Island Railroad Co.*, 997 F.2d 1028, 1037-38 (2d Cir. 1993) ("The doctrine of judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding . . . [and] protects the sanctity of the oath and the integrity of the judicial process,").

The plaintiff's certified statements to the SSA regarding her disability fall within the purview of judicial estoppel.  As the Second Circuit has observed, however, in *Cleveland v. Policy Management Systems Corporation* the Supreme Court "held that the mere fact that a plaintiff files for social security benefits (and thus, represents herself to be disabled) does not create a presumption that she is unable to perform the essential functions of her job, and thus, unable to prove an ADA claim."  526 U.S. 795, (1999); *see also DeRosa v. National Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (discussing *Cleveland*, 526 U.S. at 802-03).  Rather, the Supreme Court noted, "there are . . . many situations in which an [SSA] claim [for benefits] and an ADA claim can comfortably exist side by side," *id*. at 802-03, because "the statutory schemes have different definitions of disability; the ADA includes the notion of reasonable accommodation, whereas the SSDI system does not."  *DeRosa*, 595 F.3d at 103.

"Where a case involves an apparent conflict between
the two sets of statements, the plaintiff must offer some
explanation for the inconsistency." *Parker v. Columbia Pictures
Indus.*, 204 F.3d 326, 333 (2d Cir. 2000). "'To defeat summary
judgment, that explanation must be sufficient to warrant a
reasonable jury's concluding that, assuming the truth of, or the
plaintiff's good faith belief in, the earlier statement, the
plaintiff could nonetheless perform the essential functions of
the job, with or without reasonable accommodation.'" *Id.*
(quoting *Cleveland*, 526 U.S. at 807).

The Second Circuit "ha[s] cautioned, however, that
before applying judicial estoppel to factual claims in ADA
cases, 'a court must carefully consider the contexts in which
apparently contradictory statements are made to determine if
there is, in fact, direct and irreconcilable contradiction.'"
*DeRosa*, 595 F.3d at 104 (quoting *Rodal*, 369 F.3d at 119).
Accordingly, "the court must undertake a fact-specific analysis
of whether the claims made in the SSDI application directly
contradict the allegations made in the ADA context." *Parker*,
204 F.3d at 333; *Felix v. New York City Transit Auth.*, 154 F.
Supp.2d 640, 651 (S.D.N.Y. 2001) (same).

In *DeRosa*, the Second Circuit reversed a district
court's grant of summary judgment to defendant-employer with
respect to a plaintiff's ADA claim because statements made by

28

the plaintiff in his application for SSDI benefits did not give
rise to judicial estoppel.  595 F.3d at 101.  There, the
plaintiff's SSDI application included, *inter alia*, "the
sentences 'I became unable to work because of my disabling
condition on October 13, 2004' and 'I am still disabled.'"  *Id.*
at 101.  Noting that "a simple averment that one is disabled for
the purposes of an SSDI application does not preclude the
argument that one could, with reasonable accommodation, be
gainfully employed," the Second Circuit found that the factual
statement in plaintiff's SSDI application "[did] not contradict
DeRosa's position on the critical issue of whether he was able
to fulfill the essential functions of his employment with
reasonable accommodation."  *DeRosa*, 595 F.3d at 104-05.
Accordingly, the Second Circuit reversed the district court's
grant of summary judgment to defendants on the basis of judicial
estoppel.  *Id.*

Likewise, in the instant case, plaintiff's application
for SSDI benefits stated in general terms that she "became
unable to work because of [her] disabling condition on July 8,
2005," and that as of August 30, 2007, the date of her
application, she remained disabled.  (Cerasia Decl. Ex. Q at 3-
4.)  "The statement 'I am disabled' on an SSDI application
should generally be taken as a statement that 'I am disabled for
the purposes of the Social Security Act'" because "[t]he Social

Security Act does not concern itself with reasonable
accommodation." *DeRosa*, 595 F.3d at 104.  "The doctrine [of
judicial estoppel] is quite limited, and for a plaintiff to be
prevented from making a later assertion, there must be a direct
and irreconcilable contradiction between the earlier and later
statements." *Markus v. Teachers Ins. & Annuity Ass'n College
Retirement Equities Fund*, No. 03 Civ. 646, 2005 WL 742635, at *4
(S.D.N.Y. Mar. 29, 2005) (citing *Mitchell v. Washington Cent.
Sch. Dist.,* 190 F.3d 1, 7 (2d Cir. 1999)).

Accordingly, plaintiff's statement in her SSDI
application, by itself, does not give rise to judicial estoppel.
"As the Supreme Court made clear in *Cleveland*, a simple averment
that one is disabled for the purposes of an SSDI application
does not preclude the argument that one could, with reasonable
accommodation, be gainfully employed." *DeRosa*, 595 F.3d at 104.
The statements on plaintiff's SSDI application "do not
contradict [plaintiff's] position on the critical issue of
whether [s]he was able to fulfill the essential functions of
[her] employment with reasonable accommodation." *Id*. at 105.
Therefore judicial estoppel does not apply here to bar
plaintiff's ADA claim. *See Felix*, 154 F. Supp. 2d at 651
(citing *Cleveland*, 526 U.S. at 802) (where plaintiff's SSDI
application "stated in general terms that she could not work as
a result of her disabling condition without offering particular

30

facts as to that condition," there were no "directly conflicting statements about purely factual matters") (internal quotations marks omitted).

Moreover, the court finds that plaintiff has provided a sufficient explanation for the inconsistency, because she has consistently asserted that she could have continued to work with a reasonable accommodation. *See Nodelman v. Gruner & Jahr USA Publ*'g, No. 98 Civ. 1231, 2000 WL 502858, at *8 (S.D.N.Y. Apr. 26, 2000) (finding that plaintiff was not judicially estopped from claiming to be qualified for his position at defendant employer, even though he represented for purposes of SSDI benefits that he was "totally disabled," because plaintiff had "proffered a sufficient explanation for the inconsistency of his claims [by arguing] that he would have been able to perform his job had he been provided reasonable accommodations").

Defendant also argues that plaintiff is bound by certified statements made by plaintiff's physician to the SSA, (*see* Def. Mem. at 7); however, at least one court has found that "judicial estoppel has only been applied when the record contains factual statements made by the claimant that directly contradict the claimant's later ADA claims." *Floyd v. Mount Sinai Med. Ctr. Personnel Dir.*, No. 04 Civ. 556, 2005 WL 2174001, at *2 n.2 (S.D.N.Y. Sept. 8, 2005). In *Floyd*, an ADA defendant argued that in addition to plaintiff's statements,

31

judicial estoppel applied to medical records submitted by
plaintiff to the SSA. *Id.* The district court found that
defendant's argument improperly "broaden[e]d the reach of
judicial estoppel beyond its intended use." *Id.*

      The defendant's reliance on *EEOC v. Greater Baltimore
Medical Ctr., Inc.* is misplaced. There, the plaintiff claimed
to his former employer that he was able to work *without
restrictions* (*i.e.*, without accommodation). 769 F. Supp. 2d
843, 848 (D. Md. Jan. 21, 2011) Here, however, plaintiff
maintained that she was able to perform her role as an Inflight
Supervisor with a reasonable accommodation, which does not
conflict with her SSDI application because "[t]he Social
Security Act does not concern itself with reasonable
accommodation." *DeRosa*, 595 F.3d at 104.

      For the foregoing reasons, the court finds that
plaintiff is not judicially estopped from claiming that she was
qualified for her Inflight Supervisor position, even though she
represented for purposes of SSDI benefits that she was "totally
disabled."

**III. Timeliness of Plaintiff's Discrimination Claims**

      **A. ADA Claim**

      Defendant contends that any claims that accrued before
January 20, 2006 should be dismissed as time-barred because they
accrued more than 300 days before plaintiff filed her EEOC

32

complaint on November 16, 2006.  (ECF No. 46, Defendant's
Memorandum of Law in Support of Its Motion for Summary Judgment
("Def. Mem."), at 9.)  Plaintiff does not appear to dispute this
contention.

"As a predicate to filing suit under [the ADA], a
private plaintiff must first file a timely charge with the
EEOC." *Riddle v. Citigroup*, 449 F. App'x 66, 69 (2d Cir. 2011)
(citing 42 U.S.C. § 12117(a)).  "Under [the ADA], a plaintiff
may not assert claims based on events that took place more than
300 [or 180] days before the submission of an administrative
charge of discrimination to the EEOC or other local employment
discrimination agency . . . ." *Lomako v. New York Inst. of
Tech.*, No. 09 Civ. 6066, 2010 WL 1915041, at *4 (S.D.N.Y. May
12, 2010).

"To be timely, a charge must be filed within 180 days
or 300 days of the date on which the plaintiff receives notice
of her termination, depending upon whether the plaintiff has
initially instituted proceedings with a State or local agency
capable of granting relief." *Riddle*, 449 F. App'x at 69 (citing

42 U.S.C. § 2000e-5(e)(1)).[10]  Plaintiff filed her EEOC claim on
November 16, 2006.  Accordingly, any of plaintiff's claims that
accrued before January 20, 2006 are barred as untimely.

### B. NYSHRL and NYCHRL Claims

Defendant contends that, because plaintiff had three
years after her claim accrued to file suit, plaintiff's NYSHRL
and NYCHRL claims are time-barred and should be dismissed
because the last adverse employment action taken by JetBlue —
defendant's termination of plaintiff's employment — occurred on
July 12, 2006, more than three years before Morse filed her
lawsuit on November 19, 2009.  (Def. Mem. at 9.)

The parties do not dispute that NYSHRL and NYCHRL
claims are subject to a three-year statute of limitations.  *See*
*Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 238 (2d
Cir. 2007) (noting that "claims under the NYSHRL and the NYCHRL
are time-barred unless filed within three years of the alleged
discriminatory acts").  Plaintiff contends, however, that the
statutes of limitations under NYSHRL and NYCHRL were tolled

---

[10] The 300-day limitation applies if the person aggrieved "has
initially instituted proceedings with a State or local agency with authority
to grant or seek relief from such practice or to institute criminal
proceedings."  42 U.S.C. § 2000e-5(e)(1).  In all other cases, the 180-day
limitation applies.  *Id.*  Although the parties appear to agree that the 300-
day limitation applies, the record is unclear as to whether plaintiff
instituted any action with a state or local agency before filing her charge
with the EEOC.  Plaintiff filed her EEOC charge on November 16, 2006.  Under
the 180-day standard, any of plaintiff's claims which accrued before May 20,
2006 (180 days before November 16, 2006) are time-barred.  Under the 300-day
standard, any claims plaintiff accrued before January 20, 2006 (300 days
before November 16, 2006) is time-barred.  Because the parties appear to
agree that the 300-day limitation applies, the court analyzes plaintiff's
claims according to that limitation.

between November 16, 2006 and November 6, 2008, the period during which her EEOC complaint was pending.  (Pl. Mem. at 9.)

Courts in this Circuit have tolled the statute of limitations applicable to NYSHRL and NYCHRL claims during the pendency of any complaint that is filed with the New York Division of Human Rights ("NYDHR") or the EEOC.  *Sundaram v. Brookhaven Nat. Labs.*, 424 F. Supp. 2d 545, 565 (E.D.N.Y. 2006) ("Because complaints filed with the EEOC are deemed constructively to be cross-filed with the NYDHR, the statute is also tolled during the pendency of a claim filed with the EEOC."); *see Ritterband v. Hempstead Union Free School Dist.*, No. 06-CV-6628, 2008 WL 3887605, at *9 n.9 (E.D.N.Y. Aug. 20, 2008) (extending limitations period for claims made pursuant to NYSHRL by the number of days between the filing and denial of plaintiff's EEOC charge); *see also Wilson v. New York City Police Dep't*, No. 09 Civ. 2632, 2011 WL 1215735, at *4 (S.D.N.Y. Mar. 25, 2011) ("Courts in this circuit have held that the statute of limitations applicable to claims under NYCHRL and

NYSHRL is tolled during the period in which the complaint is filed with the EEOC").[11]

Accordingly, the limitations periods for plaintiff's claims made pursuant to NYSHRL and NYCHRL are extended by 721 days, the number of days between the filing and grant of plaintiff's EEOC charge.  The defendant's motion for summary judgment on the NYHRL and NYCHRL claims on the basis that they are time-barred is denied.

**IV.  NYSHRL and NYCHRL Claims**

A claim of disability discrimination under the NYSHRL is governed by the same legal standards as govern federal ADA claims.  *Parker*, 204 F.3d at 332 n.1.  "Thus, to the extent that [a plaintiff] brings a state-law disability-discrimination claim, it survives or fails on the same basis as [plaintiff's] ADA claim."  *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006).  Therefore, consistent with the ADA, "[t]he NYSHRL and the NYCHRL also require participation in . . . an

---

[11] "Although the Second Circuit has yet to definitively opine on the issue of whether the filing of a charge with the EEOC serves to automatically toll the statute of limitations on claims asserted under NYSHRL and NYCHRL, numerous courts in this Circuit have held that the three-year statute of limitations applicable to claims under NYSHRL and NYCHRL 'is tolled during the period in which a complaint is filed . . . with the EEOC.'" *Esposito v. Deutsche Bank AG*, No. 07 Civ. 6722, 2008 U.S. Dist. LEXIS 101460, at *14-15 (S.D.N.Y. Dec. 15, 2008).  As defendant notes, however, other courts in this Circuit have concluded that NYSHRL and NYCHRL claims are not tolled by the filing of a claim with the EEOC.  *See, e.g.*, *Osorio v. Source Enters.*, No. 05 Civ. 10029, 2006 U.S. Dist. LEXIS 63032, at *8 (S.D.N.Y. Sept. 1, 2006); *Gilani v. NASD*, No. 96 Civ. 8070, 1997 U.S. Dist. LEXIS 12287, at *31 n.5 (S.D.N.Y. Aug. 18, 1997).  In light of the remedial purpose of the ADA, NYSHRL, and NYCHRL, the court elects to follow what appears to be the majority view in this district that the state and city limitations periods are tolled during the pendency of an EEOC complaint.

interactive process to sustain a failure to accommodate claim."
*Noel v. BNY-Mellon Corp.*, No. 11-4478-cv, 2013 U.S. App. LEXIS
5067, at *3 (2d Cir. Mar. 14, 2013).

NYCHRL claims "have typically been treated as co-
extensive with state and federal counterparts." *Loeffler v.
Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009).
"However, the New York City Council has rejected such
equivalence." *Id.* Pursuant to the Local Civil Rights
Restoration Act of 2005, N.Y.C. Local Law No. 85 ("Restoration
Act"), interpretations of New York state or federal statutes
with similar wording may only be used "'to aid in interpretation
of New York City Human Rights Law, viewing similarly worded
provisions of federal and state civil rights laws as a floor
below which the City's Human Rights law cannot fall.'" *Id.*
(quoting Restoration Act § 1). Because a motion for summary
judgment inquires only as to whether a "rational factfinder
could find in favor of the non-moving party," as opposed to what
the "ceiling" of a claim may be, the court herein applies an
identical analysis to plaintiff's ADA, NYSHRL, and NYCHRL
claims. *Graves II*, 353 F. App'x at 560.

## V.    Failure to Reasonably Accommodate Claim

"An employer violates the ADA . . . when it fails to
'mak[e] reasonable accommodations to the known physical or
mental limitations of an otherwise qualified individual with a

disability who is an applicant or employee,' unless the employer can establish that the accommodations would 'impose an undue hardship.'" *Jackan v. N.Y. State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000) (quoting 42 U.S.C. § 12112(b)(5)(A)). For purposes of the ADA, a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009) (quoting 42 U.S.C. § 12111(8)).

"A plaintiff suing under the ADA for disability discrimination bears the burden of establishing a prima facie case." *Graves*, 457 F.3d at 183-84. "A plaintiff makes out a prima facie case of disability discrimination arising from a failure to accommodate by showing each of the following: '(1) [P]laintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'" *McBride*, 583 F.3d at 96-97 (quoting *Graves*, 457 F.3d at 184); *see also Rodal*, 369 F.3d at 118.

## A. Disability Under the ADA

An individual who has "a physical or mental impairment
that substantially limits one or more of the major life
activities" is a person with a disability under the meaning of
the ADA. *Giordano v. City of New York*, 274 F.3d 740, 747 (2d
Cir. 2001) (quoting 42 U.S.C. § 12102(2)). "The existence of a
disability must be determined on a 'case-by-case' basis."
*Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005)
(quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184,
198 (2002)). JetBlue does not contest that plaintiff is
disabled. (*See* Def. 56.1 ¶¶ 24, 31, 39-42; *see generally* Def.
Mem.) The ADA defines a "qualified individual" under the
statute as "an individual who, with or without reasonable
accommodation, can perform the essential functions of the
employment position that such individual holds or desires." 42
U.S.C. § 12111. JetBlue does contest that plaintiff is a
"qualified individual." (*See* Def. 56.1 ¶¶ 39-44; *see generally*
Def. Mem.)

## B. Employer Covered By ADA and Notice

JetBlue does not contest that it is an employer
covered by the ADA. (*See* Def. 56.1 ¶ 3; *see generally* Def.
Mem.) Nor does JetBlue contest that it had notice of
plaintiff's disability. (*See* Def. 56.1 ¶¶ 24, 31, 39-42; *see
generally* Def. Mem.)

39

## C. Essential Functions of the Job

Because the ADA does not define the term "essential functions," the Second Circuit has referred to regulations promulgated by the EEOC, which indicate that "essential functions" encompass "the fundamental job duties of the employment position." *McBride*, 583 F.3d at 98 (quoting 92 C.F.R. § 1630.2(n)(1)); *see Stone v. City of Mount Vernon*, 118 F.3d 92, 97 (2d Cir. 1997) (quoting 29 C.F.R. § 1630.2(n)(1)(1996) ("The term 'essential functions,' which is not defined in the statutes themselves, is generally defined in ADA regulations promulgated by the [EEOC] to mean the 'fundamental' duties to be performed in the position in question, but not functions that are merely 'marginal,'")).

Under the EEOC regulations, a job function may be considered "essential" because (1) "the reason the position exists is to perform that function"; (2) there is a "limited number of employees available among whom the performance of that job function can be distributed"; and/or "[t]he function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function." 29 C.F.R. § 1630.2(n)(2). The EEOC regulations further indicate that "[e]vidence of whether a particular function is essential includes, but is not limited to":

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

"In approaching this inquiry, a court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." *Shannon v. New York City Transit Auth.*, 332 F.3d 95, 100 (2d Cir. 2003) (internal quotation marks omitted). "EEOC regulations further indicate that, to be qualified for a position, a plaintiff must in addition 'satisf[y] the requisite skill, experience, education and other job-related requirements of the employment position.'" *McBride*, 583 F.3d at 98 (quoting 29 C.F.R. § 1630.2(m)). Ultimately, however, "the question whether a task constitutes an essential function depends on the totality of the circumstances." *Rodal*, 369 F.3d at 120.

### 1. Plaintiff's Ability to Perform Essential Functions

Defendant argues that summary judgment is warranted because plaintiff has failed to establish by a preponderance of the evidence that she was able to perform the essential functions of her job as an Inflight Supervisor with or without reasonable accommodations.  (Def. Mem. at 23.)  Specifically, defendant contends that because Morse could not - and still cannot - fly, she could not perform an essential function of any of the four restructured Inflight Supervisor positions (Crewmember Experience, Base Operations, Systems Operations, and Onboard Experience), with or without a reasonable accommodation.  (Def. Mem. at 15, 17.)  In addition, defendant argues that the accommodation plaintiff sought, permanent elimination of the flying requirement, was not required because the law does not require an employer to eliminate an essential job function.  (Def. Mem. at 15-16.)

Plaintiff acknowledges that flying was an essential function of the Inflight Supervisor "Onboard Experience" position.  (Pl. Mem. at 16; Pl. 56.1 ¶ 4.)  Plaintiff counters, however, that in both theory and in practice, flying was not an essential function of the remaining three Inflight Supervisor jobs (Systems Operations, Experience Leadership, and Base Operations).  (Pl. Mem. at 16.)  She also contends that

42

completion of flight attendant training and requalification as a
flight attendant were not essential to the foregoing three
Inflight Supervisor jobs.  (Pl. Mem. at 18.)  Plaintiff bears
the burden of showing that with a reasonable accommodation she
could perform the essential functions of a job that JetBlue
denied.  The central issue, therefore, is whether flying was an
"essential function" of the Inflight Supervisor positions at the
time of plaintiff's termination.

### a. Pre-April 2006 Inflight Supervisor

The parties dispute whether JetBlue considered flying
to be an "essential function" of the Inflight Supervisor
position as it existed prior to April 2006.  Plaintiff testified
at her deposition that she was not required to fly very often.
(Morse Dep. at 25; Pl. 56.1 ¶ 4.)  On June 30, 2006, however,
Cozzie informed Morse that JetBlue's "current (and past)
[Position Expectations] require that all Supervisors are
qualified [Inflight Crewmembers]."  (Cozzie Dep. 98-99, 111;
Cozzie Dep. Ex. 8.)  In addition, the parties do not dispute
that the Inflight Supervisor's job description included flying
on-board airplanes and being qualified as a flight attendant.
(Def. 56.1 ¶¶ 4, 8; Pl. 56.1 ¶¶ 4, 8; ECF No. 49-3, Morse
Deposition Exhibits ("Morse Dep. Ex.") at Ex. 1.)  Specifically,
the following were enumerated among the "essential functions" in
the Inflight Supervisor Position Expectations: "Completes in-

43

flight observations and evaluate[s] Inflight Crewmembers on a consistent basis"; "Ensures understanding of job-related information by observing Inflight Crewmembers on duty"; and "Works in-flight as a qualified Flight Attendant as needed." (Def. 56.1 ¶ 4; Morse Dep. Ex. 1; Morse Dep. at 15-17, 69.)

The Inflight Supervisor responsibilities also suggest that flying was an essential function of the position. Inflight Supervisors were responsible for evaluating the in-flight performance of seventy-five to eighty of Crewmembers on "check rides." (Def. 56.1 ¶ 5; Morse Dep. at 15-17, 69.) In addition, at the time that plaintiff requested an accommodation in June 2005, JetBlue had instituted a twenty-hours-per-month flying requirement for Inflight Supervisors. (Def. 56.1 ¶¶ 5, 7; Morse Dep. at 15-17, 19, 69.) Plaintiff also estimates that despite there being some months in which she did not fly, she flew as many as twelve times per month as an Inflight Supervisor during other periods of time. (Def. 56.1 ¶ 6; Morse Dep. at 25-26.)

Plaintiff argues that she and two other individuals, Piccolo and Lewis, retained an Inflight Supervisor position without flying for extended periods of time. (Pl. 56.1 ¶¶ 7-8; Morse Dep. at 46-47, 72, 102, 110-11; Piccolo Dep. at 30-31, 35-36, 39, 41; Lewis Dep. at 46.) The undisputed facts indicate, however, that Piccolo was an *Administrative* Supervisor - not an Inflight Supervisor – when she was on "dequal" status for

approximately thirteen months between July 2004 and May 2005.
(Def. 56.1 ¶ 58; Pl. 56.1 ¶ 58; Piccolo Dep. at 9-10, 30-31, 35-
37.)  Furthermore, Lewis worked as a Systems Operations Inflight
Supervisor (after JetBlue restructured the Inflight Supervisor
position in April 2006, see *infra*) when he was dequalified and
refrained from flying.  (Def. 56.1 ¶ 56; Pl. 56.1 ¶ 56; Lewis
Dep. at 69-70.)  Accordingly, the experiences of Piccolo and
Lewis do not shed light on whether flying was an essential
function of the Inflight Supervisor position, as it existed in
July 2005, at the time that plaintiff first sought elimination
of flying duties as an accommodation for her disability.

Even viewing the facts in the light most favorable to
plaintiff, given the totality of circumstances in the record,
the court determines that flying was an essential function of
the Inflight Supervisor position as of July 2005.  Because
plaintiff was undisputedly unable to fly at that time, or any
time thereafter, the court finds that plaintiff has failed to
demonstrate that she was able to perform all the essential
functions of the Inflight Supervisor job as it existed in July
2005, and thus was not a qualified employee with a disability.

### b. *Base Operations Inflight Supervisor After April 2006*

As previously discussed, on April 3, 2006, the
Inflight Supervisor position was restructured into four

different Inflight Supervisor roles – Base Operations; Systems Operations; Crewmember Experience; and Onboard Experience. (Cozzie Dep. at 20; Cozzie Dep. Ex. 4.)  In June 2006, Morse asked Robillard and Cozzi to allow her to return to work in an administrative, non-flying position.  (Compl. ¶ 31-32.)  She also expressed willingness to work anywhere or in any position within JetBlue where her skills could be used, and she identified vacancies in Customer Service, posted on JetBlue's website, which she was qualified to fill.  (Compl. ¶ 32.)

Plaintiff claims that she was capable of performing two of the four jobs in the newly restructured Inflight Supervisor position.  (Compl. ¶¶ 26-27.)  Specifically, plaintiff claims that she was able to perform the functions of the Base Operations and Systems Operations positions.[12]  (Compl. ¶¶ 27-28.)  Because plaintiff asserts that she was capable of performing the functions of only two of these restructured Inflight Supervisor positions, Base Operations and Systems Operations, (*see* Compl. ¶¶ 27-28), the court will not discuss the functions of Onboard Experience or Crewmember Experience.

---

[12] In her opposition to summary judgment, plaintiff argues that three of the four new Inflight Supervisor positions, including Crewmember Experience in addition to Base Operations and Systems Operations, do not include flying as a "core element."  (Pl.'s Mem. at 3-4.)  Because plaintiff cannot "amend [her] complaint simply by alleging new facts and theories in [her] memoranda opposing summary judgment," the court disregards plaintiff's arguments regarding her ability to perform the Crewmember Experience Inflight Supervisor position.  *Heletsi v. Lufthansa German Airlines, Inc.*, No. 99-CV-4739, 2001 WL 1646518, at *1 n.1 (E.D.N.Y. Dec. 18, 2001).  Instead, the court considers the functions of the Base Operations and Systems Operations Inflight Supervisory positions.

Inflight Supervisors in the Base Operations role worked with Crewmembers during briefings and at the gate, and worked to support Crewmembers with customer issues at the airport terminal.  (Cozzie Dep. at 21-22.)  Base Operations Inflight Supervisors also spent time onboard aircraft to assist with passenger boarding.  (Cozzie Dep. at 24.)

Inflight Director Cozzie indicated that flying was not a "core function" of this position, but that "any [Inflight] [S]upervisor can conduct a quality support ride" and "all [Inflight] [S]upervisors flew at some point, whether it was because of an operational need or conducting a quality service ride."  (Cozzie Dep. at 23-24.)  In addition, Cozzie has consistently maintained that JetBlue's "current (and past) [Position Expectations] require that all Supervisors are qualified [Inflight Crewmembers]."  (Cozzie Dep. 98-99, 111; Cozzie Dep. Ex. 8.)

Cozzie stated that although Base Operations Inflight Supervisors did not fly full-time, flying during irregular operations was an essential function of the position.[13]  (Cozzie Dep. at 37-38.)  She also stated that "[a]ll [Inflight] [S]upervisors were required to fly, or [were] required to be

---

[13] Examples of "irregular operations" include delayed flights, canceled flights, and situations in which Crewmembers were unavailable to fly due to illness.  (Cozzie Dep. at 39.)

47

qualified [as a] flight attendant regardless if it was their day-to-day duty or not."  (Cozzie Dep. at 42.)

This requirement was listed in the Position Expectations for Base Operations Inflight Supervisors, which listed "ensur[ing] Inflight operational integrity during [irregular operations]" among the essential functions of the position.[14]  (Cozzie Dep. at 38.)  Cozzie explained that Base Operations Inflight Supervisors were required to fly as substitutes for Crewmembers when the airline's crews were short-staffed to avoid flight cancellations.  (Cozzie Dep. at 39-40.) On some occasions, Base Operations Inflight Supervisors flew as substitute Crewmembers on an impromptu basis; at other times, their substitutions were planned, such as during holidays, when short-staffing was expected.  (Cozzie Dep. at 40.)

Moreover, the expectations listed in the position description for Base Operations Inflight Supervisors included the following: "Must be qualified as an Inflight Crewmember"; "must be willing to fly trips when required by [irregular operations] situations;" "must be able to cover trips away from base overnight."[15]  (Cozzie Dep. at 50-51.)  In addition, the

---

[14] Although plaintiff did not append the relevant exhibit (Cozzie Dep. Ex. 5) to the record, this information is gathered from text that Cozzie read from the exhibit during her deposition.  (Cozzie Dep. at 38.)

[15] Although plaintiff did not append the relevant exhibit (Cozzie Dep. Ex. 5) to the record, this information is gathered from text that Cozzie read from the exhibit during her deposition.  (Cozzie Dep. at 50-51.)

written position description for the Base Operations Inflight Supervisor position also noted that the position "requires strenuous physical work," including "[h]eavy lifting, pushing or pulling of objects up to 100 pounds occasionally and/or up to 50 pounds frequently (Heavy)." (Cozzie Dep. Ex. 6 at JB 263.)

Considering the totality of the circumstances, and deferring to JetBlue's business judgment regarding the degree to which flying was integral to this role, yet viewing the facts in the light most favorable to plaintiff, the court finds that JetBlue has established that flying was an essential function of the Base Operations Inflight Supervisor position. Plaintiff does not dispute that as of June 2006, she was unable to fly. (*See* Pl. 56.1 ¶ 33.) As such, plaintiff could not perform the essential functions of this particular job with or without a reasonable accommodation.

Even assuming, *arguendo*, that flying was not an essential function of the Base Operations Inflight Supervisor position, plaintiff has failed to demonstrate that she would be able to meet the frequent and "strenuous" physical demands of the position, such as "[h]eavy lifting, pushing or pulling of objects up to 100 pounds occasionally and/or up to 50 pounds frequently." (Cozzie Dep. Ex. 6.) Indeed, a medical report that Dr. Cammisa completed in April 2006 indicated that plaintiff could only "occasionally" (up to 33 percent of the

49

time) lift or carry items that were up to ten pounds, but could never lift or carry items weighing in excess of eleven pounds. (Cammisa Dep. Ex. 2.)  Plaintiff's abilities remained similarly restricted at least for the next six months, as another report from Dr. Cammisa, dated October 19, 2006, reflects the same lifting and carrying limitations.  (Cammisa Dep. Ex. 3.) Consequently, apart from plaintiff's own statements, the record lacks evidence to support plaintiff's assertion that she could fulfill the physical demands associated with the Base Operations Inflight Supervisor position.  Accordingly, the court finds that plaintiff could not have performed the essential functions of a Base Operations Inflight Supervisor with or without accommodation.

### c. *Systems Operations Inflight Supervisor After April 2006*

Systems Operations Inflight Supervisors are intended by defendant to be the first point of contact to address Crewmembers' questions and concerns.  (*See* Cozzie Dep. at 22-23; Lewis Dep. at 35-36.)  Lewis indicated that "90 percent of [a Systems Operations Inflight Supervisor's] workload" involved providing such clarification, advice, and assistance.  (Lewis Dep. at 35-36.)  Although flying was not a "core function" of this position, Inflight Director Cozzie indicated that "any [Inflight] [S]upervisor can conduct a quality support ride" and

"all [Inflight] [S]upervisors flew at some point, whether it was because of an operational need or conducting a quality service ride." (Cozzie Dep. at 23-24.) The written expectations for the Systems Operations Inflight Supervisor position include the following requirements: "Must be qualified as an Inflight Crewmember"; "must be willing to fly trips when required by [irregular operations] situations"; "must be able to cover trips away from base overnight." (Lewis Dep. Ex. 2.)

Inflight Director Cozzie also indicated that "all supervisors flew at some point, or [were] required to be a qualified flight attendant regardless if it was their day-to-day duty or not." (Pl. 56.1 ¶ 33; Cozzie Dep. at 24, 42-51.) In addition, JetBlue implemented a substantial twenty-hour flying requirement for all Inflight Supervisors in approximately March or April of 2005. (Def. 56.1 ¶ 7; Morse Dep. at 19.) The record does not indicate whether or not this requirement was officially maintained after the Inflight Supervisor position was restructured in April 2006; however, defendant considers flying to be an essential function of all Inflight Supervisor positions even after April 2006. (Bilak Decl. ¶ 3.) Indeed, if JetBlue permanently eliminated the flying requirement from an Inflight Supervisor position for plaintiff, at least one other Inflight Supervisor would have had to perform Morse's personal

51

observation of flight attendants' job performance during
flights.  (Def. 56.1 ¶ 45; Bilak Decl. ¶ 3.)

      Other indicators support defendant's view, however,
that flying was not an essential function of the Systems
Operations Inflight Supervisor position.  Plaintiff notes that
none of the Position Expectations for the three Inflight
Supervisor positions includes a reference to qualification as a
flight attendant.  (Pl. Mem. at 16.)  Moreover, Cozzie testified
that the "core" functions of those three positions did not
involve flying.  (Pl. Mem. at 16; Pl. 56.1 ¶ 33; Cozzie Dep. at
24, 42-51.)  Morse also contends that "in actual practice, . . .
supervisors were rarely called upon to fly, further indicating
that flying was never an 'essential function.'"  (Pl. Mem. at
16.)  Morse also offers as proof the fact that between January
2005 and July 2005, she worked as an Inflight Supervisor without
flying, and "performed her job satisfactorily."  (Pl. Mem. at
17.)

      Lewis testified that his job involved functions that
were sedentary in nature, (*see* Lewis Dep. at 34-36, 40, 49), and
that "nothing in [the Systems Operations Inflight Supervisor]
position required flying," (*id.* at 46).  He also testified that
he "was not required to fly [or] do[] check rides" as a Systems
Operations Inflight Supervisor, and he "did not have a group of
flight attendants that directly reported [to him] that [he] had

52

to follow up on their performance or attendance." (Lewis Dep.
at 49.) Nevertheless, Lewis, who was on "dequal" status for one
month during which he worked full-time as a Systems Operations
Inflight Supervisor and was permitted to retain his position
without flying, was informed that he had to requalify as a
flight attendant "or else . . . [he] couldn't be a[n Inflight]
[S]upervisor." (Lewis Dep. at 69, 71.) The parties do not
dispute that once JetBlue informed Lewis that in order to
maintain his Inflight Supervisor position he would have to
become qualified as a flight attendant, Lewis did so. Lewis'
compliance with the request to become qualified, however, is not
necessarily dispositive as to whether his Systems Operations
Inflight Supervisor position required flying as an essential
element of the position.

        Considering the totality of the circumstances,
deferring to JetBlue's business judgment regarding the degree to
which flying was integral to this role, yet viewing the facts in
the light most favorable to the non-movant, plaintiff, the court
finds that a genuine issue of fact has been established as to
whether flying was an essential job function to the Systems
Operations Inflight Supervisor position. The position
description indicated that the Systems Operations Inflight
Supervisor position was "sedentary" and physical effort was
"generally not required, or up to 10 pounds occasionally, 0

53

pounds frequently," (Lewis Dep. Ex. 2).  Thus, a genuine issue
of fact exists as to whether plaintiff could perform the
essential elements of a Systems Operations Inflight Supervisor,
with or without a reasonable accommodation.

### D. Plaintiff's Proposed Accommodations

Plaintiff's first accommodation request in July 2005
was that she be permitted to work as an Inflight Supervisor
without having to fly, just as she had done in the previous
period, from January 2005 until July 2005, before her STD leave
began.  (Def. 56.1 ¶ 33; Pl. 56.1 ¶ 33.)  As the court
previously stated, any claim that accrued prior to January 20,
2006 is time-barred.  Additionally, plaintiff has failed to
establish a genuine issue as to her inability to fly and thereby
perform the essential function of flying required by the
Inflight Supervisor position as it existed in July 2005, prior
to the restructuring into four categories of Inflight Supervisor
in April 2006.

"In the context of the ADA, [a] reasonable
accommodation may include, *inter alia*, modification of job
duties and schedules, alteration of the facilities in which a
job is performed, acquisition of devices to assist the
performance of job duties, and, under certain circumstances,
'reassignment to a vacant position.'"  *McBride*, 583 F.3d at 97
(quoting 42 U.S.C. § 12111(9)(B)); *see also Jackan*, 205 F.3d at

54

566 ("[T]he term 'reasonable accommodation' may include . . .
reassignment to a vacant position." (quoting 42 U.S.C. §
12111(9))).  "The plaintiff bears the burdens of both production
and persuasion as to the existence of some accommodation that
would allow her to perform the essential functions of her
employment, including the existence of a vacant position for
which she is qualified." *McBride*, 583 F.3d at 97.  "An employee
is qualified for a position only if she can perform its
essential functions." *McBride*, 583 F.3d at 98; *see Rodal*, 369
F.3d at 120; *see also Jackan*, 205 F.3d at 565-66; *Norville v.
Staten Island Univ. Hosp.*, 196 F.3d 89, 98 (2d Cir. 1999).
Finally, "an employer need not reassign an employee if no
position is vacant.  Nor is the employer obliged to create a new
position to accommodate the employee." *Norville*, 196 F.3d at 99
(citation omitted).

After her leave in June 2006, Morse allegedly asked
Robillard and Cozzi to allow her to return to work in an
administrative, non-flying capacity.  (Morse Dep. at 181, 182-
84, 186.)  Plaintiff also expressed a willingness to work
anywhere in JetBlue where her skills could be used.  (*See id.* at
181, 183-84.)  Defendant asserts that between March 2006 and
August 2006, there were no job vacancies for a Customer Service
Supervisor position at JFK International Airport.  (Def. 56.1 ¶
47; Toppin Decl. ¶ 5.)  Plaintiff testified, however, that she

saw a job listing on the company intranet for a Customer Service
job at JetBlue when she sought to return to work in July 2006.
(Pl. 56.1 ¶ 47; Morse Dep. at 183.)  Defendant has produced no
evidence to rebut plaintiff's claim that vacancies for Customer
Service Supervisor positions were posted on JetBlue's employee
intranet between March and August 2006, and concedes that
searching for and retrieving such material had been very
difficult.  (Beranbaum Decl. Ex. 16 at 2.)

Plaintiff contends that she was qualified to perform
two positions outside of the Inflight Supervisor roles when she
sought to resume active employment at JetBlue in June 2006.
One position that plaintiff claims she was qualified to fill was
in Customer Service, and the other was in Inflight Scheduling,
both of which positions plaintiff saw on the JetBlue intranet.
(*See* Morse Dep. at 183-84, 186.)  Plaintiff asserts that JetBlue
did not consider her request to transfer to either of those two
jobs.  (Pl. 56.1 ¶ 34.)  To defeat summary judgment, plaintiff
must demonstrate that such positions existed and that she was
qualified to perform the essential functions of those positions.

Toppin, JetBlue's Manager of Talent Acquisitions,
confirmed that JetBlue had two vacant Supervisor Crew
Services/Inflight Scheduling positions in May 2006.  (Toppin
Decl. ¶ 2.)  These positions required four to six years of
scheduling experience.  (*Id.*; Def. 56.1 ¶ 48.)  Two individuals,

56

Crespo and Capps, were promoted to fulfill the two vacancies in Supervisor Crew Services on June 7 and 13, 2006, respectively. Defendant claims that it is undisputed that Morse did not meet the minimum qualifications for these positions, but that Crespo and Capps did and were therefore "objectively more qualified" than Morse. (Toppin Decl. ¶¶ 3-4.) There is scant evidence of what, if any, qualifications were necessary for this position. (*See* ECF No. 83-24, Deposition of Jonathan Toppin ("Toppin Dep.") at 48 (discussing only requirement of four to six years of crew scheduling experience).)

Toppin initially claimed to have reviewed plaintiff's resume and work history before determining that "she does not meet the minimum qualifications for these positions." (Toppin Decl. ¶ 2.) At deposition, however, Toppin admitted that at the time he signed his Declaration he had not read plaintiff's employment application. (Toppin Dep. at 50.) Upon review of Morse's employment application, which describes Morse's prior job experience in the airline industry, Toppin conceded that Morse met the minimum qualifications for the Supervisor Crew Services positions. (*Id.* at 48.) Toppin's concession creates a genuine issue of material fact as to whether Morse would have qualified for the Supervisor Crew Services positions, and whether she would have been more qualified than Crespo and Capps.

57

Given the totality of circumstances, and viewing the record in the light most favorable to the plaintiff, the court finds that plaintiff has presented sufficient evidence for a reasonable jury to conclude that plaintiff, with reasonable accommodation, could perform the essential functions of two non-flying supervisor positions with JetBlue: Customer Service Supervisor and a Crew Services/Inflight Scheduling Supervisor, neither of which, the parties agree, require flying.  The court also finds that plaintiff has presented sufficient evidence for a reasonable jury to conclude that these alternative positions were available at the time plaintiff requested an accommodation in June and July 2006.

### D. Reasonableness of Plaintiff's Proposed Accommodations

In *Borkowski v. Valley Central Sch. District*, 63 F.3d 131, 137-38 (2d Cir. 1995), the Second Circuit established a two-step process to determine whether a defendant-employer's failure to provide a proposed accommodation constitutes a violation of the ADA.  First, "[t]he plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment, including the existence of a vacant position for which she is qualified." *McBride*, 583 F.3d at 97. "If the plaintiff meets that burden, the analysis shifts to the

question whether the proposed accommodation is reasonable; on
this question the burden of persuasion lies with the defendant."
*Jackan*, 205 F.3d at 566 (citing *Borkowski*, 63 F.3d at 138); *see
also McBride*, 583 F.3d at 97 n.3 ("[W]ith regard to the
reasonableness of a proposed accommodation, a plaintiff bears
only a light burden of production that is satisfied if the costs
of the accommodation do not on their face obviously exceed the
benefits.  The burden of persuasion falls on the defendant
employer,").

        In an ADA action in which the employer has allegedly
failed to reasonably accommodate an allegedly disabled employee,
"'[u]ndue hardship' is an employer's affirmative defense, proof
of which requires a detailed showing that the proposed
accommodation would 'requir[e] significant difficulty or
expense' in light of specific enumerated statutory factors."
*Rodal*, 369 F.3d at 121-22.  These statutory factors include "(1)
the employer's type of operation, including its composition,
structure, and the functions of its workforce; (2) the
employer's overall financial resources; (3) the financial
resources involved in the provision of the reasonable
accommodation; and (4) the impact of such accommodation upon the
employer's operation."  *Id.* at 122.

        JetBlue first argues that it accommodated plaintiff
for more than eighteen months prior to terminating Morse

pursuant to the JetBlue Termination Policy. (Def. Mem. at 11-13.) Specifically, JetBlue claims that allowing plaintiff to work as an Inflight Supervisor without having to fly from early January through July 7, 2005, and then granting plaintiff a twelve-month short term disability leave from July 8, 2005 through July 12, 2006, constituted a reasonable accommodation.

The court first notes that the Second Circuit has "never expressly held that leaves of absence from an employee's job taken in order to recover from the employee's disability are 'reasonable accommodations' under the ADA," but "assuming that [leaves of absence] could be [considered 'reasonable accommodations']. . . they must enable the employee to perform the essential functions of his job." *Graves II*, 353 F. Appx' at 560. The undisputed evidence here is that plaintiff was not performing any functions of her job while on STD and LTD.

Second, the fact that plaintiff satisfactorily worked for defendant for six months in a non-flying capacity suggests that plaintiff's accommodation request would not have been unduly burdensome on defendant. *Compare Jackson v. City of New York*, No. 06-CV-1835, 2011 U.S. Dist. LEXIS 43861, at *43-44 (E.D.N.Y. Mar. 3, 2011) (allowing other insulin-dependent employees to continue working created question of fact as to burden of allowing plaintiff to likewise continue working), *adopted in relevant part by* 2011 U.S. Dist. LEXIS 43861

(E.D.N.Y. Apr. 22, 2011), *with Graves II*, 353 F. App'x at 560-61 (affirming summary judgment for defendants because the plaintiff, a disabled individual, "failed to make a prima facie case that his requested accommodation . . . was reasonable because he made no showing that [defendant employer] at the time of the request had any assurance whatsoever that the accommodation would allow [plaintiff] to perform the essential functions of his job").

Third, JetBlue has offered no detailed evidence as to the statutory factors to substantiate that allowing plaintiff to remain employed in a non-flying capacity would have been unduly burdensome. Instead, defendant relies on the Robert Bilak declaration, which conclusorily asserts that accommodating plaintiff's request for an Inflight Supervisor position would require that another Inflight Supervisor perform plaintiff's inflight observation duties, resulting in additional costs and the loss of scheduling continuity. (Bilak Decl. ¶ 3.) Plaintiff has presented evidence that other Inflight Supervisors gladly took on inflight duties without resulting scheduling difficulties and, thus, disputes defendant's contentions as to undue burden. *See Rodal*, 369 F.3d at 122 ("[W]ithout concrete information, we cannot conclude as a matter of law that the burden was so disproportionately heavy as to absolve the

[defendant employer] from its reasonable accommodation obligations under the ADA,").

Because plaintiff's accommodation requests involved allowing her to transfer to either a Customer Service Supervisor or Supervisor Crew Services position, for which a jury could find plaintiff was qualified and which undisputedly do not require that plaintiff be able to fly, a reasonable jury could find that plaintiff's requested accommodation does not, on its face, impose an undue burden on JetBlue.

### E. Interactive Process

"The ADA envisions an 'interactive process' by which employers and employees work together to assess whether an employee's disability can be reasonably accommodated." *Jackan*, 205 F.3d at 566 (citing 29 C.F.R. 1630.2(o)(3)). "Once the interactive process has been initiated by the employee's request for accommodation, the regulations contemplate that the employer, 'using a problem solving approach,'" will:

> (1) Analyze the particular job involved and determine its purpose and essential functions;
>
> (2) Consult with the individual with a disability to ascertain the precise job-related limitations imposed by the individual's disability and how those limitations could be overcome with a reasonable accommodation;
>
> (3) In consultation with the individual to be accommodated, identify potential

accommodations and assess the effectiveness
each would have in enabling the individual
to perform the essential functions of the
position; and

(4) Consider the preference of the
individual to be accommodated and select and
implement the accommodation that is most
appropriate for both the employee and the
employer.

*EEOC v. Yellow Freight Sys.*, No. 98 Civ. 2270, 2002 U.S. Dist.
LEXIS 16826, at *76-77 (S.D.N.Y. Sept. 4, 2002).

Nevertheless, "the ADA imposes liability for, *inter
alia,* discriminatory refusal to undertake a feasible
accommodation, not mere refusal to explore possible
accommodations where, in the end, no accommodation was
possible."[16] *McBride*, 583 F.3d at 100. Accordingly, "an
employer's failure to engage in a sufficient interactive process
does not form the basis of a claim under the ADA and evidence
thereof does not allow a plaintiff to avoid summary judgment
unless she also establishes that, at least with the aid of some
identified accommodation, she was qualified for the position at
issue." *Id.* at 101.

As the court previously found, plaintiff has
established sufficient evidence from which a reasonable jury
could find that plaintiff requested and was qualified for an

_____

[16] Unlike the ADA, under the NYSHRL and the NYCHRL, an employer's
failure to engage in the interactive process is, by itself, a violation of
the law. *See Phillips v. City of New York*, 66 A.D.3d 170, 176 (1st Dep't
2009).

available accommodation in the form of a transfer to non-flying positions, including Systems Operations Inflight Supervisor, Customer Service and Inflight Scheduling.  Defendant argues, however, that plaintiff was not in fact capable of returning to work in July 2006 because plaintiff had not provided JetBlue with medical authorization to return to work.  (*See* Def. Mem at 12, 14; Def. 56.1 ¶ 28.)  JetBlue principally relies upon the fact that at the time of Morse's termination in July 2006, Morse had not presented a doctor's note clearing her to return to work, and, therefore, that Morse necessarily could not have performed the essential duties of any position.  (*See* Def. Mem. at 14, 19.)

There is no evidence that JetBlue ever demanded that Morse obtain medical authorization prior to returning to work with an accommodation.  Additionally, although JetBlue's employee policy is clear that Crewmembers returning to work from STD must provide their supervisor with "a completed Medical Return to Work authorization form," (Morse Dep. Ex. 7 at Section G.4.2.), it is unclear on the face of the policy, what procedure, if any, is required in order for Crewmembers to return to work from LTD, (*compare id.*, regarding procedure for Crewmembers to return to work from STD, *with id.* at Section G.5, regarding LTD generally, but not delineating a procedure for Crewmembers to return to work from LTD.)  Plaintiff also

64

testified that she had previously asked Jenkins whether she should procure a clearance note from a doctor, and Jenkins said it was unnecessary and that Jenkins would rely on plaintiff's representations regarding her ability to fly.  (Morse Dep. at 60-61, 93-94.)

In *Parker v. Columbia Pictures*, the Second Circuit addressed a similarly vague employee work policy.  The Circuit first noted that "the record does not indicate that employees on medical leave were required to submit a clearance from their doctors *prior* to returning to work."  204 F.3d at 336 n.4 (emphasis in original).  The Second Circuit concluded that "[o]n summary judgment, we are unprepared to conclude from this evidence that Parker's failure to produce a doctor's note clearing him for part-time work relieved [defendant employer] entirely from investigating [plaintiff's] potential accommodation."  *Id.*  The court is likewise unprepared to conclude as a matter of fact that JetBlue's employee policy required Morse to have obtained medical authorization prior to returning to work or to prompt defendant to engage in an interactive process with defendant about her accommodation request.

Further, it is undisputed that plaintiff clearly represented to defendant in June 2006 that she was physically capable of returning to work in any position that did not

65

require her to fly.  (*See* Def. 56.1 ¶¶ 33-34; Pl. 56.1 ¶¶ 33-
34.)  Indeed, Dr. Cammisa testified that as of April 6, 2006,
plaintiff could possibly have been able to perform "limited
duty, part-time sedentary" work.[17]  (Cammisa Dep. at 37.)

Lastly, JetBlue does not dispute that, despite having
repeatedly inquired with her supervisors and others about
obtaining an accommodation in June 2006, plaintiff was never
spoken to by a member of People Compliance, JetBlue's office in
charge of evaluating reasonable accommodations.  (*See* Def. 56.1
¶¶ 33-36; Morse Dep. Ex. 12 at Section B.5; Morse Dep. Ex. 20
(June 15, 2006 letter by Morse to Robillard detailing Morse's
attempts to speak with the People Department and her frustration
at having "heard from no one").)

Based on the foregoing evidence, the court finds that
plaintiff has established sufficient evidence by which a
reasonable jury could find that JetBlue did not engage in an
interactive process with plaintiff in response to her clear
requests for an accommodation.  *Cf. Lovejoy-Wilson v. NOCO Motor
Fuel, Inc.*, 263 F.3d 208, 218-19 (2d Cir. 2001) ("[Defendant]
provides no evidence that it took any steps toward engaging in

---

[17] Plaintiff also cites to a September 2007 form on which Doctor
Cammisa indicated that plaintiff "could perform occupations that are
generally performed seated, but have duties that allow alternating between
sitting, standing and walking."  (Pl.'s 56.1 ¶ 41 (citing Cammisa Dep. Ex.
5).)  Because this form was prepared by Doctor Cammisa more than a year after
plaintiff was terminated by JetBlue in July 2006, it is irrelevant to the
instant motion.

an interactive process, such as 'meeting with the employee who
requests an accommodation, requesting information about the
condition and what limitations the employee has, asking the
employee what he or she specifically wants, showing some sign of
having considered the employee's request, and offering and
discussing available alternatives when the request is too
burdensome.'" (alterations in original omitted)).

        For the foregoing reasons, the court finds that
material questions of fact remain as to whether JetBlue
discriminatorily refused to consider Morse's requests for a
reasonable accommodation.  Defendant's motion for summary
judgment on plaintiff's failure to accommodate claim is
therefore denied.

**VI.  Discriminatory Discharge Claim**

        **A. Legal Standard**

        "The ADA prohibits 'discriminat[ion] against a
qualified individual on the basis of disability in regard to[,
*inter alia,*] . . . discharge of employees.'"  *McBride*, 583 F.3d
at 96 (quoting 42 U.S.C. § 12112(a)) (alteration in original).
"Claims alleging disability discrimination in violation of the
ADA are subject to the burden-shifting analysis originally
established by the Supreme Court in *McDonnell Douglas Corp. v.
Green*," 411 U.S. 792, (1973).  *Id.* (citing *Sista v. CDC Ixis N.
Am., Inc.,* 445 F.3d 161, 169 (2d Cir. 2006)); *see also Greenway*

67

*v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998)

(applying *McDonnell Douglas* to ADA claim).

       To establish a *prima facie* case of discrimination

under the ADA, a plaintiff must show by a preponderance that:

(1) the plaintiff's "employer is subject to the ADA"; (2) the

plaintiff "is disabled within the meaning of the ADA or

perceived to be so by [the plaintiff's] employer"; (3) the

plaintiff "was otherwise qualified to perform the essential

functions of the job with or without reasonable accommodation";

and (4) the plaintiff "suffered an adverse employment action

because of [the plaintiff's] disability." *Brady v. Wal-Mart*

*Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008) (citing *Jacques*

*v. DiMarzio, Inc.*, 386 F.3d 192, 198 (2d Cir. 2004)); *see Sista*,

445 F.3d at 169 (same).

       If the plaintiff meets the burden of establishing a

*prima facie* case, "[t]he burden of production then shifts to

defendants, who must offer through the introduction of

admissible evidence a non-discriminatory reason for their

actions that, if believed by the trier of fact, would support a

finding that unlawful discrimination was not a cause of the

disputed employment action." *Heyman v. Queens Vill. Comm. for*

*Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198

F.3d 68, 72 (2d Cir. 1999) (citing *Chambers v. TRM Copy Ctrs.*

*Corp.*, 43 F.3d 29, 38 (2d Cir. 1994)).  A plaintiff must then

"produce evidence and carry the burden of persuasion that the proffered reason is a pretext."[18]  *Sista*, 445 F.3d at 169.

## B. Application

Defendant does not dispute that plaintiff has satisfied the first two elements of a *prima facie* case for discriminatory discharge under the ADA: (1) JetBlue is subject to the ADA; and (2) that the plaintiff is disabled within the meaning of the ADA.  (*See* Def. Mem. at 23-24.)  Nor can there be "any question that termination is an adverse employment action."[19]  *Sista*, 445 F.3d at 169.  Defendant contends, however, that plaintiff cannot show, by a preponderance of evidence, that she was qualified to perform the essential functions of her position with or without a reasonable accommodation, or that the circumstances surrounding her termination give rise to an inference of discriminatory animus.  (*See* Def. Mem. at 21-22.)

As the court has already found, plaintiff presented a material issue of fact with regard to her ability to perform the

---

[18] Plaintiff erroneously argues that the burden-shifting framework in *McDonnell Douglas* does not apply to claims of discriminatory discharge and that the appropriate analysis was set forth in *Parker*, 204 F.3d at 332. (Pl.'s Mem. at 26.)  As the Second Circuit explained in *McBride*, however, the *McDonnell Douglas* framework is appropriate and *Parker* "merely stands for the entirely ordinary proposition that an employer's failure to make a reasonable accommodation, particularly when coupled with a refusal to engage in a sufficient interactive process, makes out a *prima facie* case of disability discrimination where the plaintiff has also made a sufficient showing that, *inter alia,* she is qualified for the position at issue."  *McBride*, 583 F.3d at 102.

[19] Plaintiff also alleges that "JetBlue's action in giving the choice of taking short-term disability leave or be fired [in July 2005] represented an adverse employment action."  (Compl. ¶ 23.)  Because this claim accrued before January 20, 2006, it is time-barred under the ADA.

essential functions of the Systems Operations Inflight Supervisor position.  Plaintiff has also raised material issues of fact as to her qualifications and ability to perform the essential functions of the Supervisor Crew Services position and the Customer Service Supervisor position, and as to the availability of those positions at the time plaintiff requested an accommodation in June and July 2006.  Therefore, the court finds that plaintiff has established a *prima facie* case for discriminatory discharge under the ADA.

Defendant claims that Morse was terminated pursuant to its "neutral" 52-week administrative termination policy, which it argues is a valid, non-discriminatory basis for Morse's termination.  (*See* Def. Mem. at 12-13, 23.)  According to JetBlue, because its policy "was applied uniformly to disabled and non-disabled crewmembers alike, the policy is lawful."  (*Id.* at 12.)  Second Circuit law does not support such a sweeping argument.

Although, as defendant notes, some courts addressing summary judgment motions in ADA claims, including this one, have acknowledged that uniformly applied leave policies can provide a proper basis on which to terminate an employee, those courts did not exclusively rely upon the leave policies to dismiss the plaintiffs' claims.  *See, e.g.*, *Benjamin v. Health & Hosps. Corp.*, No. 07-CV-2487, 2009 U.S. Dist. LEXIS 83051, at *28

70

(E.D.N.Y. Sept. 11, 2009) (dismissing ADA claim where it was undisputed that plaintiff was medically incapable of returning to work); *Chasse v. Computer Scis. Corp.*, 453 F. Supp. 2d 503, 520-21 (D. Conn. 2006) (dismissing ADA claim where plaintiff could not return to work for two to three months after leave period expired).

Morse's situation is arguably more akin to that addressed by the Second Circuit in *Parker*, in which the plaintiff's employer claimed to have terminated plaintiff "not because he was disabled, but because he was unable to return to work when his six months' disability leave expired."  204 F.3d at 338.  The Second Circuit found, however, that "[t]erminating a disabled employee . . . who can perform the essential functions of the job but cannot return to work because the employer has denied his request for reasonable accommodation, is disability discrimination under the ADA."  *Id.*  The Circuit further stated that "[f]ailure to consider the possibility of reasonable accommodation for . . . disabilities, if it leads to discharge for performance inadequacies resulting from the disabilities, amounts to a discharge solely because of the disabilities."  *Id.* (internal quotation marks omitted).

JetBlue does not dispute that Morse requested an accommodation in order that she could timely return to work prior to activation of the JetBlue Termination Policy.  (*See*

71

Def. 56.1 ¶¶ 33-34.)  Nor does JetBlue dispute that it did not
offer Morse the non-flight positions she requested as
accommodations prior to her termination.  (*See id.* ¶¶ 35-38.)
As noted above, plaintiff has produced sufficient evidence for a
reasonable jury to find that JetBlue failed to adequately
consider Morse's accommodation requests for a non-flight
position in June 2006.  Further, although Dr. Camissa found in
April 2006 that plaintiff was "100% totally disabled" with
respect to plaintiff's ability to fly on airplanes, (Camissa
Dep. Ex. 2), Dr. Camissa also testified that plaintiff could
"possibly" have been able to perform "limited duty, part-time
sedentary" work, (Camissa Dep. at 37).  This raises a question
as to Morse's ability to have timely returned to work at JetBlue
before her 52-week administrative termination.  *See Parker*, 204
F.3d at 338 ("Although [defendant] claims that Parker was not
medically cleared for work at that time, his medical reports no
longer prescribed 'no work,' suggesting at least the possibility
that Parker had recovered enough to resume his duties with some
accommodation").

     Lastly, it again bears noting that the EEOC found that
JetBlue "maintained an inflexible 52-week maximum leave policy .
. . that create[d] a pattern or practice of denying reasonable
accommodation to, and discriminating against, a nationwide class
of individuals with disabilities in violation of the ADA from at

least March 2004 to [November 2008]."  (Pl. 56.1 ¶ 29; EEOC
Determination.)   The Second Circuit has held that "a finding of
probable cause by an administrative agency, such as the EEOC,
though not determinative, is admissible to help establish [a]
prima facie case."  *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d
476, 481 (2d Cir. 1985).[20]

In light of the above, the court finds that plaintiff
has established a *prima facie* case for discriminatory discharge
against JetBlue, and that plaintiff has produced evidence that
JetBlue's purported non-discriminatory reason for terminating
plaintiff, its 52-week administrative termination policy, was
pretext.  *See Sista*, 445 F.3d at 169.  Defendant's motion for
summary judgment on plaintiff's discriminatory discharge claim
is therefore denied.

### CONCLUSION

For the foregoing reasons, defendant's motion for
summary judgment is granted in part and denied in part.
Specifically, the court hereby:

1)   denies defendant's request to dismiss plaintiff's
     claims on the basis of judicial estoppel;

2)   grants defendant's request to dismiss as time-barred
     plaintiff's ADA claims that accrued prior to January
     20, 2006;

---

[20] Although the court in *Field v. Tonawanda City Sch. Dist.* held
that "[f]indings of discrimination by the EEOC [alone] are not admissible
evidence, *per se*, sufficient to avoid summary judgment," here, plaintiff has
produced substantial evidence in support of her claims in addition to the
EEOC's determination.  604 F. Supp. 2d 544, 555 (W.D.N.Y. 2008).

3)    denies defendant's request to dismiss as time-barred
      plaintiff's NYSHRL and NYCHRL claims, which accrued as
      of the beginning of plaintiff's STD leave on July 7,
      2005;

4)    denies defendant's request to dismiss plaintiff's
      reasonable accommodation claim with regard to
      (i) the Base Operations Inflight Supervisor position,
      (ii) the Customer Service position, and (iii) the
      Inflight Scheduling position; and

5)    denies defendant's request to dismiss plaintiff's
      discriminatory discharge claim.

      The parties are ordered to meet and confer regarding

settlement and how they intend to proceed in this action, and to

submit a joint status letter to the court no later than April

19, 2013.

**SO ORDERED.**

Dated:  Brooklyn, New York
        March 31, 2013

                          _____/s/_____
                          KIYO A. MATSUMOTO
                          United States District Judge